UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/13/14
```

------------------------------------------------------------X
                                     :

KWAME GARNETT,                    :

                                    :

                   Plaintiff(s),  :              1:13-cv-7083-GHW

                                    :

               -against-          :        OPINION AND ORDER

                                    :

THE CITY OF NEW YORK, ET AL.     :

                                    :

                   Defendant(s).  :

                                    :

------------------------------------------------------------X

GREGORY H. WOODS, District Judge:

Plaintiff Kwame Garnett brings this action, pursuant to 42 U.S.C. § 1983 ("Section 1983"), against two undercover officers of the New York City Police Department for his allegedly wrongful arrest and prosecution in connection with a drug sale that occurred on November 19, 2011. The undercover officers ("UC 0039" and "UC 0243") move for summary judgment on all claims. The Court grants summary judgment in favor of UC 0243 with respect to Garnett's false arrest, malicious prosecution, and denial of a right to a fair trial claims, as Garnett cannot show that UC 0243 was personally involved in his arrest and prosecution. However, because a genuine issue of material fact exists with respect to Garnett's false arrest, malicious prosecution, and denial of a right to a fair trial claims against UC 0039 and with respect to his failure to intervene claim against UC 0243, the Court denies summary judgment as to those claims.

I.      **Background**[1]

A.      **Facts**

1.      <u>The November 19, 2011 Narcotics Operation</u>

On the evening of November 19, 2011, undercover officers UC 0039 and UC 0243, along with Officers Neftali Betances and Tyrone Viruet, were members of a tactical team conducting a "buy-and-bust" narcotics operation on the block of Lexington Avenue between 115th and 116th streets, a block known for the recurrent sale of narcotics.  Pl. Resp. 56.1 ¶¶ 2, 5-6.  Pursuant to the planned operation, UC 0243 and UC 0039 walked along the east side of Lexington Avenue in an attempt to purchase narcotics.  *Id.* ¶ 8.  UC 0243 acted as the primary undercover officer and UC 0039 acted as the ghost undercover officer.  *Id.* ¶ 9.  Meanwhile, certain members of the tactical team (the "field officers"), including Officers Betances and Viruet, were stationed in police vehicles in the surrounding area, waiting for communication from the undercover officers.  *Id.* ¶ 10.

At approximately 6:15 p.m., in front of Lexington Grocery, located at 1865 Lexington Avenue between 115th and 116th streets, UC 0243 and UC 0039 encountered two individuals, later identified as Naim Roper and Wakuan Cintron.  *Id.* ¶¶ 13-15.  At about the same time, UC 0039 also observed Garnett on the same block.  *Id.* ¶ 14.  Garnett testified at his deposition that he knew Roper and Cintron – they had grown up together in the same neighborhood.  Aroubas Decl. Exh. H at 63:17-21, 67:2-8.  As the officers approached, Roper offered to sell UC 0243 marijuana.  Pl. Resp. 56.1 ¶ 16.  When UC 0243 conveyed that he was also looking to purchase cocaine, Cintron became

---

[1] The Court's summary of the underlying facts of this case is drawn from the parties' submissions relating to defendants' motion for summary judgment, including:  Defendants' Local Civil Rule 56.1 Statement of Undisputed Facts ("Def. 56.1") (Dkt. 39); Plaintiff's Response to Defendants' 56.1 Statement ("Pl. Resp. 56.1") (Dkt. 47); Declaration of Shlomit Aroubas in Support of Defendants' Motion for Summary Judgment ("Aroubas Decl.") (Dkt. 40); and Declaration of Robert T. Perry in Support of Plaintiff's Opposition to the Motion for Summary Judgment ("Perry Decl.") (Dkt. 46).  References to a paragraph in the parties' 56.1 statements incorporate by reference the evidentiary materials cited therein.

engaged in the conversation as well.  *Id.* ¶ 17.  Meanwhile, UC 0039 stood nearby observing the

exchange and the surrounding area.  *Id.* ¶ 18.  He testified that he saw Garnett appearing to act as a

lookout.  Aroubas Decl. Exh. C at 88:21-90:2, 96:6-23, Exh. C2 at 19:3-22, Exh. G at 38:5-17, 55:21-

57:14.

      UC 0243 then followed Roper and Cintron into Lexington Grocery, trailed by UC 0039.  Pl.

Resp. 56.1 ¶ 19.  Once inside the store, UC 0243 proceeded toward the back of the store with Roper

and Cintron.  *Id.* ¶ 20.  UC 0039 stayed close to the store's entrance, which was held open, where he

was able to observe UC 0243 transacting with Roper and Cintron as well keep an eye on the street.

*Id.* ¶ 21.  UC 0243 purchased cocaine from Cintron and marijuana from Roper in exchange for cash,

a transaction which UC 0039 observed.  *Id.* ¶¶ 23-25.

      It is here that the parties' version of events diverge.  According to UC 0039, Garnett entered

the store as the transaction was taking place looking angry, "very authoritative towards [Roper and

Cintron]," and appearing to act "in the managerial position." Aroubas Decl. Exh. G at 53:5-15.  UC

0039 further testified that Garnett then made statements to Roper and Cintron, though UC 0039's

account of the statement varies slightly over time:

- in the Follow Up report that UC 0039 prepared, UC 0039 wrote that Garnett said, "YO HURRY UP, YA'LL AIN'T DONE YET, GET THAT MONEY, I'M NOT LOOKING TO GET LOCKED UP TONIGHT, LET'S GO." *Id.* Exh. K;

- in the criminal complaint prepared by Officer Viruet, UC 0039 relayed Garnett's statements as, "YO HURRY UP, YA'LL AIN'T DONE YET, GET THAT MONEY, I'M NOT LOOKING TO GET LOCKED UP TONIGHT." *Id.* Exh. B at P003;

- at the criminal trial, UC 0039 testified, "[Garnett] told them…why are you taking so long.  Hurry up.  [Garnett] stated – he said, get that money, let's get out of here.  You are taking too long.  Let's go.  [Garnett] used the word stupid.  [Garnett] also stated he was not looking to get locked up – I'm not looking to get locked up tonight.  Hurry up and let's go." *Id.* Exh. C at 96:6-23;

- at his deposition in the course of this litigation, UC 0039 testified, "[Garnett] doesn't yell, but he very sternly speaks to [Cintron and Roper], and he says, in sum and substance, "What the fuck is taking you guys so long?  Hurry up.  You guys are stupid.  Hurry up…[Garnett] used the 'f' word and he used the word 'stupid.'  And

he also stated in sum and substance, 'I'm not looking to get locked up tonight.  You guys are taking too long.'" *Id.* Exh. G at 44:7-17.

UC 0039 further testified at Garnett's criminal trial that in response to Garnett's statements, Roper and Cintron "started hurrying up, moving faster . . . they looked to be moving quicker than they were before." *Id.* Exh. C at 95:14-21.  UC 0039 also testified that Garnett engaged in a transaction with the store clerk (although at his deposition UC 0039 could not recall whether Garnett brought anything from the store clerk, *id.* Exh. G at 47:21-48:3), before moving to the doorway, looking around, saying "let's go," then exiting the store.  *Id.* Exh. C at 97:1-9, 97:5-11.  UC 0039 testified that Roper and Cintron then exited the store, by which time Garnett had crossed the street into a music store.  *Id.* at 97:11-17.

UC 0243 testified at the criminal trial that during the transaction, Garnett walked into the store and said something loud that "grabbed Mr. Cintron's attention" and caused Cintron to look over UC 0243's shoulder.  *Id.* at 23:3-6; Pl. Resp. 56.1 ¶ 26.  Though Garnett was standing about four feet away from UC 0243 when he made the statement, UC 0243 claims that he did not hear what Garnett said.  Aroubas Decl. Exh. C at 48:1-4, 55:4-23, 60:12-8.  At his deposition, UC 00243 said he did not know whether Garnett's statement was loud or not, but that it appeared to "alarm[]" Cintron.  *Id.* Exh. F at 54:6-14.

Garnett testified at his deposition that he was not involved in the narcotics transaction; rather, he says he placed an order at Crown Fried Chicken next door to Lexington Grocery, and that while waiting for his chicken, he walked to Lexington Grocery to buy a soda, but decided not to enter because the store appeared too crowded.  Aroubas Decl. Exh. H at 74:3-5, 78:19-79:4, 79:9-81:24.  In his 56.1 Statement, however, Garnett does not dispute Roper's testimony that there were no other customers inside the store at the time Roper entered with Cintron and UC 0243.  Pl. Resp. 56.1 ¶ 22; *see also* Aroubas Decl. Exh. I at 32:16-33:1.  Garnett claims that he then returned to Crown

Fried Chicken to buy the chicken, put the chicken in his pocket, then crossed the street and entered the music store.  Aroubas Decl. Exh. I at 81:22-82:2, 84:5-7.  He also testified that he had spent the day at his sister's house and then at his grandmother's house, and that the first time he saw Roper and Cintron that day was inside the prisoner van following their arrests.  *Id.* at 74:6-78:25, 130:4-17.

In seeming contradiction to Garnett's testimony, Roper testified at his deposition that earlier in the evening, he, Garnett, and Cintron had been hanging out at a friend's house nearby for several hours before leaving together to walk towards the area around Lexington Grocery, but that Garnett left to buy chicken at Crown Fried Chicken before the drug transaction took place.  *Id.* Exh. I at 30:2-31:8, 58:5-59:1, 59:4-62:3, 67:19-68:25, 104:11-105:2.  However, Roper said that Garnett never entered the store, never made any statements inside the store, and that he did not have any involvement in the narcotics transaction.  *Id.* at 34:16-35:18.  Roper also said that while he was inside the store engaging in the transaction, he saw Garnett walk from Crown Fried Chicken to the music store across the street with a brown bag in his hand.  *Id.* at 38:1-40:19.

Cintron, on the other hand, stated under oath at his plea hearing that he "acted in concert with Garnett to knowingly and unlawfully sell cocaine to a police officer on that evening."  *Id.* Exh. N at 6:17-22, Pl. Resp. 56.1 ¶ 60.

       **2.**    <u>The Arrest</u>

After the narcotics transaction was completed, UC 0243 signaled to UC 0039 that the transaction yielded a purchase of narcotics.  Pl. Resp. 56.1 ¶ 32.  Both undercover officers then exited the store with Cintron and Roper.  *Id.* ¶ 33.  UC 0039 began transmitting radio communication to the field officers, informing them that the narcotics transaction was successful and involved three individuals.  *Id.* ¶ 34.  UC 0039 testified, however, that during this time he never communicated anything about Garnett to UC 0243, Aroubas Decl. Exh. C at 18:7-2; Garnett does not allege otherwise.

5

As the field officers moved onto the block on Lexington Avenue between 115th and 116th Streets, UC 0039 transmitted a description of the three individuals along with their possible locations to the field officers.  Pl. Resp. 56.1 ¶ 35.  UC 0039 provided a description of Garnett as "gray hoodie with hoodie on, blue jeans, male black five ten, 170, across the street inside electronics store."  *Id.* ¶ 37.  It is undisputed that UC 0243 did not communicate to the field officers any information about Garnett.  *Id.* ¶ 38.

Upon receiving the transmission from UC 0039, the field officers drove their vehicles to the block between 115th and 116th streets on Lexington Avenue and arrested Roper and Cintron.  *Id.* ¶¶ 39-42.  In addition, based on UC 0039's description and directions over the radio, Officer Betances entered the El Barrio music store on Lexington Avenue and apprehended Garnett.  *Id.* ¶ 43.  Upon exiting the store, UC 0039 confirmed to Officer Betances that he had apprehended the right individual.  *Id.* ¶ 44.  UC 0243 was not involved in confirming the identity of Garnett.  *Id.* Officer Betances then arrested Garnett.  *Id.* ¶ 45.

### 3. Post-Arrest Events

Following Garnett's arrest, Officer Viruet prepared the relevant arrest papers and criminal court complaint charging Garnett with criminal offenses relating to the narcotics transaction.  The complaint states, in relevant part, that Officer Viruet was informed by UC 0039 that UC 00039 observed the marijuana and cocaine transaction between UC 0243, Roper, and Cintron inside 1865 Lexington Avenue, and that UC 0039 immediately thereafter observed Garnett enter the grocery store and state "YO HURRY UP, Y'ALL AIN'T DONE YET, GET THAT MONEY, I'M NOT LOOKING TO GET LOCKED UP TONIGHT."  *Id.* ¶ 47.  The complaint also charged Cintron and Roper with criminal offenses relating to the narcotics transaction.  *Id.* ¶ 48.

In connection with the operation, UC 0243 prepared a Buy Report identifying Roper and Cintron.  *Id.* ¶ 49.  UC 0243 did not mention Garnett in the report.  *Id.* ¶ 50, Aroubas Decl. Exh. C

at 56:4-21.  In addition, UC 0039 prepared a Follow Up Report identifying Roper and Cintron as

well as Garnett, whom he observed walking into the store and stating, "in sum and substance," "YO

HURRY UP, Y'ALL AIN'T DONE YET, GET THAT MONEY, I'M NOT LOOKING TO GET

LOCKED UP TONIGHT.  LET'S GO." *Id.* Exh. K.

On November 25, 2011, Roper pleaded guilty to the criminal sale of marijuana in the fourth

degree and criminal facilitation in the fourth degree.  Pl. Resp. 56.1 ¶ 52.  Meanwhile, the cases

against Garnett and Cintron were presented to a grand jury empaneled in the county of New York.

*Id.* ¶ 53.  UC 0243 and UC 0039 provided testimony relating to the November 19, 2011 operation to

the grand jury; however, only UC 0039 provided any testimony relating to Garnett.  *Id.* ¶¶ 54-55,

Aroubas Decl. Exh. C at 56:22-60:2.  UC 0243 did not mention Garnett in his testimony at all.  *Id.*

The grand jury indicted Garnett for the sale of a controlled substance in the third degree.  Pl. Resp.

56.1 ¶ 57.  Cintron was indicted for the criminal sale of a controlled substance in the third and for

criminal possession of a controlled substance.  *Id.* ¶¶ 56-58.

On January 31, 2012, Cintron pleaded guilty to the criminal sale of a controlled substance in

in response to the indictment against him.  *Id.* ¶ 59.  During the plea proceeding, Cintron stated,

under oath, that he "acted in concert with Garnett to knowingly and unlawfully sell cocaine to a

police officer on or about November 19, 2011 in New York County."  *Id.* ¶ 60.

Garnett moved to dismiss the indictment or reduce the criminal charges against him.  *Id.*

¶ 62.  These motions were denied.  *Id.*  At a June 27, 2012 *Gethers* Hearing to determine the legality

of Garnett's arrest, UC 0039 testified about his role in the November 19, 2011 narcotics operation.

*Id.* ¶¶ 64-68.  At the conclusion of the hearing, the judge found that UC 0039 was "a credible

witness." *Id.* ¶ 71.  The judge also found that "the arrest of [Garnett] was in fact based upon

probable cause," and that the identification of Garnett by UC 0039 immediately after his arrest was

confirmatory in nature.  *Id.* ¶ 72.  Garnett notes, however, that at the time, his attorney did not have

access to information that may have allowed him to cross-examine UC 0039 about the alleged

discrepancies between UC 0039's testimony and his Follow Up Report, and about an incident in

November 2008 in which Garnett may have been with several individuals who robbed UC 0039.  Pl.

Resp. 56.1 ¶ 69, Aroubas Decl. Exh. G at 64:4-67:3.

Garnett then proceeded to trial on the charges against him.  Resp. 56.1 ¶ 61.  Both UC 0039

and UC 0243 testified at Garnett's criminal trial.  *Id.* ¶ 73.  UC 0039 testified that he (1) observed

Garnett appearing to act as a lookout prior to the transaction, (2) observed Garnett enter the store

and make statements to Cintron and Roper to hurry and complete the transaction, (3) transmitted

information to the field officers relating to Garnett, (4) described Garnett to the field officers, (5)

directed Officer Betances into the store where Garnett was located, and (6) confirmed to Officer

Betances that Garnett was indeed the individual UC 0039 described.  *Id.* ¶ 74, Aroubas Decl. Exh. C

at 88:21-90:2, 96:6-23, Exh. C2 at 19:3-22.  UC 0243 testified that he (1) engaged only with Roper

and Cintron on the street and during the narcotics transaction, (2) did not observe Garnett on the

street, (3) saw Garnett in the store during the sale transaction, but did not hear Garnett's statement,

(4) did not provide any information relating to Garnett to the field officers, and (5) made no

mention of Garnett in his Buy Report because he never interacted directly with Garnett.  Pl. Resp.

56.1 ¶ 75.  On July 6, 2012, Garnett was acquitted by the trial jury.  *Id.* at ¶ 76; Compl. Exh. A ¶ 44.

Because Garnett had not been able to post bail following his arrest, he spent nearly eight months in

detention before being released upon his acquittal.  *Id.* at ¶¶ 37, 45.

### B.    Procedural History

On October 4, 2013, Garnett filed this action.  Dkt. 1.  On December 9, 2013, Garnett filed

an Amended Complaint.  Dkt. 23.  Defendants filed a motion to dismiss the amended complaint on

December 20, 2013.  Dkt. 24.  On February 10, 2014, Judge Rakoff dismissed all of Garnett's claims

except for his:  (1) false arrest claims against UC 0039, UC 0243, and Officers Betances and Viruet,

(2) failure to intervene claim against UC 0243, (3) federal and state malicious prosecution claims

against UC 0039 and UC 0243, (4) denial of the right to fair trial claims against UC 0039 and UC

0243, (5) state law negligent screening, hiring, and retention claim against the City of New York, and

(6) state law negligent training and supervision claim against the City of New York.  Dkt. 33, 42.

Defendants moved for summary judgment on March 27, 2014.  Dkt. 38.  On April 21, 2014,

Garnett withdrew his claims against Officers Betances and Viruet, as well as the City of New York.

Perry Decl. at ¶¶ 3-4 (Dkt. 46).  Thus, the only claims remaining for consideration on summary

judgment are:  (1) false arrest under § 1983 against UC 0039 and UC 0243; (2) malicious prosecution

under § 1983 and New York state law against UC 0039 and UC 0243; (3) denial of the right to a fair

trial under § 1983; and (4) failure to intervene under § 1983 against UC 0243.

## II.     Defendants' Motion for Summary Judgment[2]

### A.     Standard of Review

Defendants are entitled to summary judgment if they can show that "there is no genuine

dispute as to any material fact and that [they are] entitled to judgment as a matter of law."  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)).  A dispute is genuine if "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact

is material if it "might affect the outcome of the suit under governing law."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).

To defeat a motion for summary judgment, the non-movant "must come forward with

'specific facts showing that there is a genuine issue for trial.'"  *Matsushita Elec. Indus. Co., Ltd. v. Zenith*

*Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)).  "Mere speculation or

---

[2] The following abbreviations are used herein for the parties' memoranda of law:  (1) Defendants'
Memorandum of Law in Support of the Motion for Summary Judgment ("Def. Br.") (Dkt. 41); (2) Plaintiff's
Memorandum of Law in Opposition to the Motion for Summary Judgment ("Pl. Br.") (Dkt 44); and (3)
Defendants' Reply Memorandum of Law in Further Support of the Motion for Summary Judgment ("Def.
Rep. Br.") (Dkt. 53).

conjecture as to the true nature of the facts" will not suffice, *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation omitted), nor will wholly implausible alleged facts or bald assertions that are unsupported by evidence, *see Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991); *Argus Inc. v. Eastman Kodak Co.*, 801 F.2d 38, 45 (2d Cir. 1986) (citing *Matsushita*, 475 U.S. 574, 585-86).

In determining whether a genuine dispute as to a material fact exists, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (citing *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir. 2003)). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 254 (2d Cir. 2002). Rather, the Court must decide whether a rational juror could find in favor of the non-moving party. *Id.*

## B.   Analysis

### 1.   False Arrest

Garnett claims that UC 0039 and UC 0243 caused him to be arrested and imprisoned without probable cause to believe that he had committed a crime, in violation of his right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments. Compl. ¶ 48. Defendants argue that there was probable cause for Garnett's arrest, and that UC 0243 in any event cannot be held liable for false arrest because he was not personally involved in the arrest. Def. Br. p. 4-9.

A § 1983 claim for false arrest is substantially the same as a claim for false arrest under New York law. *Weyant v. Okst,* 101 F.3d 845, 852 (2d Cir. 1996). To state a claim for false arrest under New York law, a plaintiff must show that: "(1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Posr v. Doherty*, 944 F.2d 91, 97 (2d Cir. 1991).

However, probable cause to arrest is a complete defense to a claim of false arrest. *Jaegly v. Couch*, 439 F.3d 149, 152 (2d Cir. 2006). This is true even where a person is ultimately acquitted, because probable cause to arrest constitutes justification. *See Weyant,* 101 F.3d at 852 (citing *Bernard v. United States,* 25 F.3d 98, 102 (2d Cir. 1994)).

"Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Golino v. City of New Haven,* 950 F.2d 864, 870 (2d Cir. 1991). Probable cause is to be determined from the "totality of the circumstances" and must be weighed in terms of what was "understood by those versed in the field of law enforcement." *United States v. Ceballos*, 812 F.2d 42, 50 (2d Cir. 1987) (citing *United States v. Cortez,* 449 U.S. 411, 418 (1981)). The Second Circuit has held that a determination of probable cause to arrest may be made "as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant,* 101 F.3d at 852 (citations omitted).

As a preliminary matter, the Court finds that because UC 0243 was not personally involved in Garnett's arrest, he cannot be held liable for false arrest. Absent any personal involvement, an individually-named defendant cannot be held liable for a plaintiff's alleged § 1983 claim. *Grullon v. City of New Haven*, 720 F.3d 133, 138 (2d Cir. 2013). With respect to a claim for false arrest, this means that each individual must have been personally involved in the arrest in order to be held liable. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir. 1995). The Second Circuit has defined "personal involvement" to mean direct participation, such as "personal participation by one who has knowledge of the facts that rendered the conduct illegal," or indirect participation, such as "ordering

or helping others to do the unlawful acts." *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir.

2001) (citing *Gaston v. Coughlin,* 249 F.3d 156, 165-66 (2d Cir. 2001).[3]

Here, the record demonstrates that UC 0243 had no personal involvement in Garnett's

arrest.  At no point before, during, or after the narcotics transaction did UC 0243 have any

interaction with Garnett; rather, UC 0243's interactions were limited only to Cintron and Roper.  Pl.

Resp. 56.1 ¶¶ 15-24.  UC 0243 did not transmit any information relating to Garnett to the field

officers, nor did UC 0039 transmit any information about Garnett to UC 0243.  *Id.* ¶¶ 34-38;

Aroubas Decl. Exh. C at 18:7-21.  UC 0243 was not involved in apprehending or arresting Garnett.

*Id.* ¶¶ 39-45.  UC 0243 did not identify or confirm the identification of Garnett to the field officers.

*Id.* ¶ 44.  Nor did UC 0243 make any mention of Garnett in the buy report he prepared following

the arrest.  *Id.* ¶ 49-50.  Garnett offers no evidence to the contrary.  *See* Compl.; Pl. Resp. 56.1; Pl.

Br. p. 4-7.  Absent such evidence, there is no dispute of fact as to whether UC 0243 was personally

involved in the arrest.  *See Travis v. Vill. of Dobbs Ferry*, 355 F. Supp. 2d 740, 752-53 (S.D.N.Y. 2005)

(finding a disputed issue of fact as to whether officer who stopped plaintiff's car, officer who placed

plaintiff under arrest, and officers who authorized and supervised the arrest were all "personally

involved" in plaintiff's arrest, but granting summary judgment in favor of officers who were merely

present on the scene and therefore not "personally involved," and warning against the "tendency to

lump all the defendants together" on the false arrest claim); *Wong v. Yoo*, 649 F. Supp. 2d 34, 61

---

[3] The requirement that an officer be personally involved in the arrest distinguishes a false arrest claim from a failure-to-intervene claim relating to an arrest, which imposes liability on an officer who is not personally involved in an arrest but nevertheless knew that an arrest lacked probable cause and did nothing to prevent it. *See Wong v. Yoo*, 649 F. Supp. 2d 34, 61 (E.D.N.Y. 2009) (distinguishing personal involvement in a false arrest, in which an officer must directly participate in an individual's arrest, from personal involvement with respect to a failure to intervene, which merely requires that the police officer know that a wrongful arrest was occurring yet do nothing to prevent it) (citing *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir. 1994)); *Travis*, 355 F. Supp. 2d 740, 752-53 (S.D.N.Y. 2005) (same).  Thus, to the extent that Garnett is arguing that UC 0243 was not personally involved in the arrest, but is liable because he knew the arrest lacked probable cause and did nothing to prevent it, this argument is addressed with respect to Garnett's failure-to-intervene claim against UC 0243 in Section II(B)(4).

(E.D.N.Y. 2009) ("Both defendants [police officers] Yoo and Viani acknowledge, however, that they acted as partners during the incident, that defendant Yoo conferred with defendant Viani more than once prior to arresting plaintiff, and that defendant Yoo shared at least some of the details of what he had learned during his investigation with defendant Viani. Based upon these facts, a reasonable fact-finder could find that defendant Viani was involved in the decision to arrest plaintiff, and therefore, that he directly participated in plaintiff's arrest.").

With respect to UC 0039, who both parties agree was involved in Garnett's arrest, Pl. Resp. 56.1 ¶¶ 15-45, the issue for the Court to determine is whether UC 0039's account of Garnett's arrest constituted "sufficient information to warrant a reasonable belief" that Garnett was involved in the drug transaction. *Brandon v. City of New York*, 705 F. Supp. 2d 261, 269 (S.D.N.Y. 2010). Based on the record before the Court, an issue of material fact exists as to whether UC 0039 had probable cause to arrest Garnett.

First, UC 0039's account of Garnett's involvement in the transaction fundamentally differs from the versions provided by Garnett and Roper, and is supported only marginally by the testimony of UC 0243. Although UC 0039 and Garnett agree that Garnett was on the block of Lexington Avenue between 115th and 116th Streets at the time UC 0243 encountered Roper and Cintron in front of Lexington Grocery, Pl. Resp. ¶ 14, UC 0039 testified that Garnett appeared to be acting as a "lookout," Aroubas Decl. Exh. C at 88:21-90:2, 96:6-23, Exh. C2 at 19:3-22, Exh. G at 38:5-17, 55:21-57:14, whereas Garnett claims that he was merely there to buy chicken next door to Lexington Grocery, *id.* Exh. H at 74:3-5, 78:19-79:4, 79:9-81:24.

During the transaction inside the store, UC 0039 claims that Garnett entered the store and made authoritative statements towards Roper and Cintron, *id.* Exh. C at 94:10-95:13, 96:18-23, Exh. G at 53:5-15, 44:7-17, Exh. K, whereas Garnett claims that he never entered the store and never made any statements to Cintron and Roper; rather, the first time he saw Cintron and Roper that day

was inside the police van following their arrests, *id.* Exh. H at 74:3-5, 78:19-79:4, 79:9-81:24, 130:4-17.  Roper also testified that Garnett did not enter the store and that he did not have any involvement in the narcotics transaction, *id.* Exh. I at 34:16-35:18 (though Roper did testify, in seeming contradiction to Garnett's testimony, that he and Cintron had spent several hours hanging out with Garnett earlier that day before heading to the area on Lexington Avenue), *id.* at 30:2-31:8, 58:5-59:1, 59:4-62:3, 67:19-68:25, 104:11-105:2.  A reasonable juror could nevertheless choose to credit Garnett's and Roper's testimony, *id.* Exh. H at 79:9-81:24, Exh. I at 34:16-35:18, particularly given the fact that no one is able to corroborate UC 0039's claim about what Garnett supposedly said, *id.* Exh. C at 55:22-23, and if a juror decided to discredit UC 0243's claim that he could not hear what Garnett said, despite being only four feet away from Garnett in a small store, *id.* Exh. C at 48:1-4, 50:11-14, 55:4-23, 60:12-8.

Second, certain parts of UC 0039's and UC 0243's accounts are inconsistent over time, further basis for a reasonable juror to discredit their testimony and to accept the version of events proffered by Garnett.  Although UC 0039 testified that Garnett appeared to be acting as a "lookout" when UC 0243 began engaging with Roper and Cintron, *id.* Exh. C at 88:21-90:2, 96:6-23, Exh. C2 at 19:3-22, Exh. G at 38:5-17, 55:21-57:14, UC 0039 failed to mention this apparently material fact in the Follow Up report he later filed, *id.* Exh K.  UC 0039's account of the Garnett's statements also vary, as noted above.  *Id.* Exh. G at 53:5-15, 44:7-17, Exh. C at 94:10-95:13, 96:18-23, Exh. K.  UC 0243 testified at Garnett's criminal trial that Garnett made a loud statement, *id.* Exh. H at 23:3-6, 55:4-23, but then later could not recall whether the statement was loud, *id.* Exh. F at 54:6-8.  Though UC 0243 later testified at Garnett's criminal trial that Garnett's statement caught Cintron's attention, he did not include this apparently material fact, or any mention of Garnett at all, in the Buy Report he prepared on the same day as the arrests; nor did UC 0243 mention Garnett in his grand jury testimony.  *Id.* at 23:3-6, Exh. C at 56:4-21, Pl. Resp. 56.1 ¶¶ 26, 50, 52.  Finally, UC 0039 testified at

Garnett's criminal trial that Garnett bought something from the store clerk, Aroubas Decl. Exh. C at 97:1-9, though at his deposition UC 0039 could not recall whether Garnett brought anything from the store clerk, *id.* Exh. G at 47:21-48:3.

Crediting Garnett's account and viewing all other evidence in his favor, including Roper's denial that Garnett was involved in the drug transaction and the inconsistencies in UC 0039's and UC 0243's accounts of the transaction, and drawing all reasonable inferences in Garnett's favor, a reasonable jury could find that there was no probable cause to arrest Garnett. *Grain Traders, Inc. v. Citibank*, 160 F.3d 97, 100 (2d Cir. 1998). Therefore, the defendants' motion for summary judgment is denied on Garnett's claim for false arrest against UC 0039.

### 2.      Malicious Prosecution

Garnett claims that UC 0039 and UC 0243 caused him to be prosecuted with malice and without probable cause, in violation of his right to be free from unreasonable search and seizure under the Fourth and Fourteenth Amendments,[4] and under New York law. Compl. ¶ 52. Defendants argue that Garnett cannot overcome the presumption of probable cause created by the grand jury indictment, that probable cause existed for his prosecution, and that malice was not a motivating factor in prosecuting him. Def. Br. p. 12-15.

To establish a claim for malicious prosecution, a plaintiff must show "(1) the initiation or continuation of a criminal proceeding against the plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for the proceeding; and (4) actual malice as a motivation." *Drummond v. Castro*, 522 F. Supp. 2d 667, 677 (S.D.N.Y. 2007) (citing *Russell v. Smith*, 68 F.3d 33, 36 (2d Cir. 1995)). In addition, the Second Circuit requires the plaintiff to show that there was "a

---

[4] The Supreme Court held in *Albright v. Oliver*, 510 U.S. 266 (1994), that an arrestee's malicious prosecution claim under § 1983 could not be based on substantive due process. *Id.* at 268. Thus, Garnett's § 1983 claim to vindicate his Fourteenth Amendment right to be free malicious prosecution is dismissed. However, under *Albright*, Garnett may proceed with his malicious prosecution claim based on the Fourth Amendment. *Id.* at 271.

seizure or other perversion of proper legal procedures implicating the claimant's personal liberty and privacy interests under the Fourth Amendment." *Washington v. County of Rockland,* 373 F.3d 310, 316 (2d Cir. 2004) (internal quotation marks omitted).  Furthermore, as with a false arrest claim, a finding of probable cause is a complete defense to an action for malicious prosecution under both § 1983 and state law.  *Graebe v. Falcetta,* 726 F. Supp. 36, 38 (E.D.N.Y. 1989), *aff'd,* 946 F.2d 883 (2d Cir. 1991).

Here, it is undisputed that a criminal proceeding was initiated against Garnett, that it terminated in his favor, and that he suffered a liberty restraint when he was incarcerated for nearly eight months prior to his acquittal.  *See* Pl. Resp. 56.1.  Therefore, the sole issues before the Court are whether there was probable cause for Garnett's prosecution and whether UC 0039 or UC 0243 were motivated by malice.

As a preliminary matter, the record does not demonstrate any genuine issue of disputed fact with respect to UC 0243's personal involvement in the alleged malicious prosecution.  As previously stated, absent any personal involvement, an individually-named defendant cannot be held liable for a plaintiff's § 1983 claim.  *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir. 2006).  UC 0243 provided no information about Garnett's involvement to Officer Viruet, who prepared the relevant arrest papers and criminal court complaint.  Pl. Resp. ¶¶ 46-47.[5]  UC 0243 did not mention Garnett at all in the Buy Report he prepared shortly after the arrest.  *Id.* ¶ 50.  UC 0243 also did not provide any testimony relating to Garnett to the grand jury.  *Id.* ¶ 55.  UC 0243 did not testify at the *Gethers* Hearing to determine the legality of the arrest.  *Id.* ¶ 67.  Nor does Garnett allege that UC 0243 provided any other information to the prosecutor or anyone else that formed the basis for Garnett's

---

[5] Although Garnett correctly points out that the criminal complaint states that Officer Viruet was "informed by [UC 0243] that the defendants acted in concert to sell the information a quantity of cocaine and marijuana in exchange for sums of U.S. currency," Pl. ¶ 47, the specific information that Officer Viruet goes on to state was supplied by UC 0243 includes no actual mention of Garnett.  Aroubas Decl. Exh. B at P003.

prosecution.  Garnett also fails to plausibly allege that UC 0243 was involved in a conspiracy with UC 0039 to maliciously prosecute him.  In *Riccuiti v. N.Y.C. Transit Authority*, for example, the Second Circuit found that a material issue of fact existed as to whether the defendants conspired to maliciously prosecute the plaintiff based on more than mere silence or acquiescence on behalf of the defendant officers.  124 F.3d 123, 129 (2d Cir. 1997).  The Court reasoned that although one of the defendants was not involved in securing the confession, a reasonable juror could find conspiracy based on the fact that the he heard the content of the confession, knew that the plaintiff had not made the statements attributed to him in that confession, and nonetheless forwarded the statement to the prosecutor's office." *Id.*  Garnett presents no such evidence of conspiracy here. Absent such evidence, summary judgment on the malicious prosecution claim must be granted in favor of UC 0243.  *See Brandon v. City of New York*, 705 F. Supp. 2d 261, 274-75 (S.D.N.Y. 2010) ("Here, because neither [defendant officer] was involved in any of the post-arrest conduct that led to [plaintiff's] prosecution (*i.e.,* drafting the arrest paperwork, swearing to the criminal complaint, or testifying before the grand jury), each lacks the requisite personal involvement to be liable pursuant to § 1983 . . .").

By contrast, UC 0039 undisputedly did supply information that led to Garnett's indictment, *see* Pl. Resp. 56.1 ¶ 47, Aroubas Decl. Exh. K, and therefore can be held liable for malicious prosecution.  As an initial matter, a grand jury indictment creates a presumption of probable cause that may be overcome "only by evidence establishing that the police witnesses have not made a complete and full statement of the facts either to the grand jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith." *Brandon*, 705 F. Supp. 2d at 272 (citing *Boyd v. City of New York*, 336 F.3d 72, 82-83 (2d Cir. 2003)).  A plaintiff must "establish what occurred in the grand jury and [] further establish that those circumstances warrant a finding of misconduct sufficient to erode the 'premise that the Grand

Jury acts judicially.'" *Rothstein v. Carriere*, 373 F.3d 275, 284 (2d Cir. 2004) (quoting *Colon v. City of New York*, 60 N.Y.2d 78, 82 (N.Y. 1983)).

Where plaintiff's only evidence is his own version of events, courts have found that such evidence amounts to nothing more than "mere conjecture and surmise that [the plaintiff's] indictment was procured as a result of conduct undertaken by the defendants in bad faith," and thus insufficient to rebut the presumption of probable cause created by the indictment. *Savino v. City of New York*, 331 F.3d 63, 73 (2d Cir. 2003).

As a result, in *Boyd*, the Second Circuit established what has been referred to as a "competing testimony plus" standard to determine whether the plaintiff has rebutted the presumption of probable cause. *Brandon*, 705 F. Supp. 2d at 273 (citing *Boyd*, 336 F.3d at 72). In *Boyd*, the issue was whether the plaintiff was arrested in his apartment and made an incriminating statement before being given his *Miranda* warnings, *id.* at 77, or whether, as the defendant officers testified, plaintiff was not arrested until he was outside the building, therefore rendering his statements admissible as the product of a noncustodial interrogation, *id.* at 74. However, the Court noted that the post-arrest worksheet prepared by the police indicated that plaintiff was arrested inside his building. *Id.* at 78. This corroboration of the plaintiff's account, or "plus factor," led the court to find a genuine issue of material fact as to the lack of probable cause. *Id.*

Here, as in *Boyd*, the Court is presented with competing versions of the events from Garnett and UC 0039. UC 0039 claims that Garnett acted as a lookout and made statements inside the store to Roper and Cintron, rushing them to complete the transaction, Aroubas Decl. Exh. C at 88:21-90:2, 96:6-23, Exh. C2 at 19:3-22, whereas Garnett denies that he had any involvement in the transaction, *id.* Exh. H at 74:3-5, 78:19-79:4, 79:9-81:24; Pl. Resp. 56.1 ¶ 26, 47, 51. While Garnett's denial alone would be insufficient to overcome the presumption of probable cause under *Boyd*, his version of the events is at least partially corroborated by Roper's testimony that Garnett never

entered the store, never made any statements, and was not involved in the drug transaction. Aroubas Decl. Exh. I at 34:16-35:18. Thus, an issue of fact as to probable cause arises out of Roper's testimony, a "plus factor" sufficient to overcome the presumption of probable cause. Therefore, the Court need not address defendants' argument that Garnett may not rely on the officers' alleged lies to the grand jury or the information recorded in the police reports and provided to the prosecutor. *See* Def. Br. p. 13 (citing *Rehberg v. Paulk*, 132 S. Ct. 1497 (2012)).

To survive summary judgment on a malicious prosecution claim, Garnett must also show that UC 0039 was motivated by actual malice. *Russell*, 68 F.3d at 36. This "does not require a plaintiff to prove that the defendant was motivated by spite or hatred, . . . [r]ather, it means that the defendant must have commenced the prior criminal proceeding due to a wrong or improper motive, something other than a desire to see the ends of justice served." *Rounseville v. Zahl*, 13 F.3d 625, 630 (2d Cir. 1994). Furthermore, under both Second Circuit and New York State law, a lack of probable cause to prosecute "generally creates an inference of malice." *Boyd*, 336 F.3d at 78; *see also Ricciuti*, 124 F.3d at 131 ("In the present case, as we have just noted, a jury could find that probable cause for the charges against the plaintiffs was lacking, and that finding alone would support an inference of malice.").[6]

Crediting Garnett's testimony that he never even entered the store and viewing all evidence in the light most favorable to him, a reasonable juror could find that the material portions of UC 0039's version of events – e.g. the statements Garnett allegedly made inside the store – were fabricated, and that probable cause was therefore lacking. Furthermore, UC 0039 testified that he was previously robbed by a group individuals that may have included Garnett, Aroubas Decl. Exh.

---

[6] Defendants argue that Garnett fails to plead that "actual malice" was a motivation for defendants' actions, as required by cases as recent as *Morales v. City of New York*, 2014 U.S. App. LEXIS 9157, at 9 (2d Cir. 2014). However, that case is inapposite, because there, the Court found that there was no issue of fact as to probable cause. In cases where the Court *does* find an issue of fact as to probable cause, as the Court has found here, *see* Section II(B)(1), malice may be automatically inferred.

G at 62:23-66:6, a prior encounter that could independently establish a malicious motive on the part of UC 0039.  Thus, a material issue of disputed fact as to malice exists, sufficient to defeat summary judgment on Garnett's malicious prosecution claim against UC 0039, under both § 1983 and New York state law.

Regarding defendants' argument that Garnett's state law malicious prosecution claim should be dismissed because Garnett failed to name the individual defendants in his Notice of Claim as required by Section 50-e of the New York General Municipal Law ("GML"), appellate courts in New York are currently split as to whether a Notice of Claim must specifically name individual officers in order for a plaintiff to subsequently maintain a lawsuit against them, and the Court of Appeals has not ruled on this issue.  *Compare Cleghorne v. City of N.Y.,* 952 N.Y.S.2d 114, 117 (N.Y. App. Div. 1st Dep't 2012) ("[T]he action cannot proceed against the individual defendants because they were not named in the notice of claim."), *with Goodwin v. Pretorius,* 962 N.Y.S.2d 539, 545 (N.Y. App. Div. 4th Dep't 2013) ("[C]ourts have misapplied or misunderstood the law in creating, by judicial fiat, a requirement for notices of claim that goes beyond those requirements set forth in the statute.  If the legislature had intended that there be a requirement that the individual employees be named in the notices of claim, it could easily have created such a requirement.").

Given the lack of clarity among New York courts, this Court adopts the position of other courts in this district in declining to find such a requirement.  *See, e.g.*, *Chamberlain v. City of White Plains*, No. 12 Civ. 5142, 2013 WL 6477334 (S.D.N.Y. Dec. 10, 2013) ("In the absence of more specific guidance, I adopt the *Goodwin* Court's well-reasoned conclusion that there is no requirement that individual defendants be specifically named in the Notice of Claim.").  This is particularly warranted where, as is the case here, the Notice of Claim was sufficient "to permit the defendant to conduct a proper investigation and assess the merits of the claim." *Aegis Ins. Servs., Inc. v. Port Auth. of N.Y. & N.J.,* 435 F. App'x 18, 25 (2d Cir. 2011), Aroubas Decl. Exh. R.  Moreover, defendants

were likely not prejudiced by the relatively minor delay between the October 3, 2012 filing deadline and the October 23, 2012 supplemental notice providing the names of UC 0039 and UC 0243, a delay due in part to the time it took for the City to provide Garnett's counsel with Garnett's criminal case file (Garnett's counsel requested the file on September 5, 2012, shortly after he was retained, but did not receive it until October 15, 2012, after the deadline to file a Notice of Claim had already passed).  Perry Decl. ¶ 6, 10; *see Delaney v. Town of Islip*, 63 A.D.3d 658, 659 (2d Dep't 2009) ("[GML] § 50-e(6) authorizes a court, in its discretion, to grant leave to serve an amended notice of claim where the error in the original notice of claim was made in good faith, and where the other party has not been prejudiced thereby.").  Therefore, Garnett's state law malicious prosecution claim against UC 0039 survives summary judgment.

### 3.    Denial of the Right to Fair Trial

Garnett claims that UC 0039 and UC 0243 fabricated evidence against him and used that evidence in legal proceedings, causing him to suffer a violation of his constitutional right to a fair trial as guaranteed by the Fifth and Fourteenth Amendments.[7]  Compl. ¶ 54.  Defendants claim that there is no evidence that they fabricated evidence against Garnett.  Def. Br. p. 16-17.

A plaintiff establishes a denial of the right to fair trial claim by showing that the defendant fabricated evidence that was likely to influence a jury, forwarded that information to prosecutors, and that the plaintiff suffered a deprivation of liberty as a result.  *Ricciuti,* 124 F.3d at 129-130.  The existence of probable cause is not a defense.  *Id.* at 130.

---

[7] Garnett fails to state a claim under the Fifth Amendment.  "The Fifth Amendment Due Process Clause protects citizens against only federal government actors," *Dusenbery v. United States,* 534 U.S. 161, 167 (2002), and since Garnett alleges deprivations only by state government officials, his claims "arise solely from the Fourteenth Amendment due process clause." *id.*  Thus, insofar as Garnett's § 1983 claim for denial of his right to fair trial is based on a violation of his constitutional rights under the Fifth Amendment, that claim is dismissed.

Garnett fails to establish a dispute of fact as to whether UC 0243 denied him a right to a fair trial. Garnett's alleged liberty restraint was the eight months he spent in jail prior to and during his criminal trial, due to his inability to post bail. Garnett presents no evidence that UC 0243 provided any information about Garnett to prosecutors prior to his trial. Pl. Resp. 56.1 ¶¶46-47, 55, 67; Aroubas Decl. Exh. C at 58:4-10. It is true that during the trial, UC 0243 provided allegedly fabricated evidence in the form of false testimony that Garnett was inside the store and that he made remarks that caught Cintron's attention. *Id.* Exh. C at 23:3-6, 55:4-23. However, it is well-established that an officers' perjured testimony at a criminal trial may not form the basis of a § 1983 claim against that officer. *Briscoe v. LaHue*, 460 U.S. 325, 325-26 (1983) ("[s]ubjecting government officials, such as police officers, to damages liability under § 1983 for their testimony might undermine not only their contribution to the judicial process but also the effective performance of their other public duties."). And outside of UC 0243's trial testimony, Garnett points to no other fabricated evidence – in the form of false testimony or otherwise – stemming from UC 0243 prior to or during the period of Garnett's detention, such that UC 0243 cannot have been personally involved in causing Garnett's deprivation of liberty. *See Ricciuti,* 124 F.3d at 129-130. Thus, summary judgment on the denial of a right to fair trial claim is granted in favor of UC 0243.

As to UC 0039, Garnett appears to allege that the officer fabricated the following evidence that made its way to the prosecutor: (i) grand jury testimony regarding Garnett's involvement in the drug transaction; (ii) information communicated to Officer Viruet about incriminating statements Garnett made inside the store during the drug transaction, which formed the basis for the criminal complaint relied on by the prosecutor; and (iii) a Follow Up Report falsely stating that Garnett made incriminating statements inside the store during the drug transaction. Pl. Resp. 56.1 ¶ 47, Aroubas Decl. Exh. B, K.

Defendants are correct that following *Rehberg*, an officer's grand jury testimony may not form the basis of any § 1983 claim against that officer.  *Rehberg*, 132 S. Ct. at 1510; *see also Jovanovic*, 486 F. App'x 149, 152 (2d Cir. 2012) ("[Plaintiff] cannot show causation—i.e., that the alleged fabrication of evidence led to a deprivation of his liberty.  That is because the only avenue by which the testimony could reach the jury was through [the defendant officer's] testimony, for which he enjoys absolute immunity.") (citing *Briscoe v. LaHue*, 460 U.S. 325, 335–336 (1983)).  This immunity applies not just to the grand jury testimony itself, but also "preparatory activity—such as a preliminary discussion in which the witness relates the substance of his intended testimony." *Rehberg*, 132 S. Ct. at 1499.  Were it otherwise, the Supreme Court reasoned in *Rehberg*, "a criminal defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves."  *Id.* at 1506 (quoting *Buckley v. Fitzsimmons*, 509 U.S. 259, 283 (1993) (Kennedy, J., concurring in part and dissenting in part)).

However, the decision in *Rehberg* only goes so far.  It did not grant absolute immunity to "*all* activity that a witness conducts outside of the grand jury room." 132 S. Ct. at 1507, n.1 (emphasis in original) (citations omitted).  Rather, "law enforcement officials who falsify affidavits and fabricate evidence concerning an unsolved crime" enjoy only qualified immunity.  *Id.*  Accordingly, courts in this Circuit have declined to grant absolute immunity to officers for allegedly falsifying evidence such as a post-arrest affidavit that contained allegedly false information, *Dowling v. City of New York*, No. 11 Civ. 4954, 2013 WL 5502867, at *7 (E.D.N.Y. Sept. 30, 2013) ("On the facts most favorable to Plaintiff, Officer Gasquez's report was at best inaccurate in a way likely to increase Plaintiff's chances of conviction."); an allegedly false and misleading police report, *Keller v. Sobolewski*, No. 10 Civ. 5198, 2012 WL 4863228, at *4 (E.D.N.Y. Oct. 12, 2012); and an allegedly false narrative of events preceding plaintiff's arrest provided to another officer, who in turn forwarded the information to the prosecutor, *Maldonado v. City of New York*, No. 11 Civ. 3514, 2014 WL 787814, at

*10 (S.D.N.Y. Feb. 26, 2014), despite the fact that those officers may have testified before a grand jury as to the same facts underlying such evidence.

Likewise, Garnett's denial of his right to fair trial claim rests on similar types of evidence not barred by *Rehberg*, namely, the allegedly falsified Follow Up report prepared by UC 0039 and the allegedly fabricated statements provided to Officer Viruet that formed the basis for the criminal complaint relied on by the prosecutor. Such evidence is therefore not barred by *Rehberg*, entitling UC 0039 to only qualified immunity for his role in their alleged fabrication. Construing the evidence in the light most favorable to Garnett and drawing all reasonable inferences in his favor, a juror could find that this allegedly fabricated evidence was likely to influence a jury's verdict and deprived Garnett of his liberty as a result. *See Ricciuti,* 124 F.3d at 130. Accordingly, Garnett's claim for denial of his right to fair trial against UC 0039 survives summary judgment.

### 4. Failure to Intervene

Garnett claims that UC 0243 failed to intervene on Garnett's behalf upon seeing that other police officers were violating his constitutional rights, despite having an affirmative duty and the opportunity to do so, in violation of the Fourth, Fifth, and Fourteenth Amendments. Compl. ¶ 56. Specifically, Garnett claims that UC 0243 knew that no probable cause existed to arrest Garnett, yet did nothing to stop the arrest. Defendants argue that UC 0243 did not know that the arrest lacked probable cause, as he reasonably relied on information provided by UC 0039. Def. Br. p. 17-18.

A police officer "has an affirmative duty to intercede on behalf of a citizen whose constitutional rights are being violated in the presence of other officers," and a failure to do so may be grounds for § 1983 liability. *Ricciuti*, 124 F.3d at 129 (quoting *O'Neill v. Krzeminski*, 839 F.2d 9, 11 (2d. Cir. 1988)). However, an officer may only be held liable if he "observes or has reason to know" that an individual's constitutional right has been violated and he had "a realistic opportunity to prevent the harm from occurring." *Andersen v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994).

Defendants argue that UC 0243 did not know that Garnett's arrest and subsequent prosecution lacked probable cause.  First, defendants note that UC 0243 did in fact observe Garnett enter the store during the narcotics transaction and make statements that caught Cintron's attention. Aroubas Decl. Exh. C at 22:18-23:8, 55:4-21, Exh. F at 41:3-14, 44:21-23, 54:6-20.  Defendants further argue that although UC 0243 did not hear what Garnett said, *Id.* Exh. C at 22:18-23:8, Exh. F at 44:25-45:12, UC 00243 reasonably relied on UC 0039's subsequent communications to the arresting field officers regarding Garnett's culpability, since UC 0039 was standing closer to Garnett when Garnett made the statements.  Thus, defendants argue, not only did UC 0342 have no reason to doubt UC 0039's assessment, he also did not have the ability to confirm or deny it.

Crediting Garnett's version of the events and drawing all inferences in his favor, however, a reasonable juror could choose to disbelieve UC 0243's testimony that he observed Garnett inside the store making statements, based not just on Garnett's and Roper's denials that Garnett ever entered the store, but also on the fact that UC 0243 does not mention this seemingly material fact in the Buy Report.  *Id.* Exh. H at 74:3-5, 78:19-79:4, 79:9-81:24; *Id.* Exh. I at 34:16-35:18.  A jury could also find unconvincing UC 0243's claim that he did not hear what Garnett said, given that the two were standing only four feet apart from each other in a small store.  Exh. C at 48:1-4, 55:4-23, 60:12-8; Pl. Resp. 56.1 ¶ 26, 50.  Therefore, a reasonable jury, crediting Garnett's and Roper's testimony, could find that UC 0243 never observed Garnett inside the store and never heard him make any incriminating statements.  That reasonable jury could therefore find that UC 0243 knew that UC 0039 and Officers Betances and Viruet did not have probable cause to arrest Garnett.

While it is true that UC 0243 may have nevertheless relied on UC 0039's assessment of probable cause, disputed questions of fact exist as to this very issue, creating a genuine issue of fact as to whether UC 0243 failed to intervene.  *See Graham v. City of New York*, 928 F. Supp. 2d 610, 622 (E.D.N.Y. 2013) ("Defendant Ugbomah was Defendant Glenn's partner and present at the scene of

the incident.  Because there are questions of fact regarding whether Defendant Glenn violated

Plaintiff's right by falsely arresting Plaintiff and using excessive force, there are also questions of fact

regarding whether Defendant Ugbomah failed to intervene."); *Wong,* 649 F. Supp. 2d at 61

(E.D.N.Y. 2009) (holding that where the two defendant police officers were partners and present at

the scene a "reasonable fact-finder could also find that defendant . . . knew that [his partner] was

making an arrest without probable cause"); *Blake v. Race,* 487 F. Supp. 2d 187, 210 (E.D.N.Y. 2007)

(finding that where certain defendants were not directly involved in but were present during the

alleged violations of plaintiff's rights, there were sufficient questions of fact for a jury to decide

whether they violated plaintiff's rights by failing to intervene).  UC 0039 and UC 0243 were partners

and in close proximity to one another throughout the incident.  *See* Aroubas Decl. Exh. C2 at 18:16-

18 ("Q:  This particular case you did not watch from afar, you stood right next to him?  A:

Correct.") (UC 0039 describing his position in relation to UC 0243 outside the store before the

transaction took place), 25:11-13 ("Q:  Approximately how many feet away from you would you say

[UC 0039] was standing?  A:  I would say maybe five feet.") (UC 0243 describing UC 0039's location

inside the store during the drug transaction); Exh. G at 26:17-28:10 (UC 0039 explaining that as the

"ghost" undercover, he would have had a two-way communication device to communicate with the

"primary" undercover, i.e. UC 0243, during the undercover operation).  Hence, a factual issue

remains as to whether UC 0243 knew that UC 0039 lacked probable cause to arrest Garnett and

cause him to prosecuted, yet failed to intervene.  Summary judgment is thus denied on Garnett's

failure to intervene claim against UC 0243.

### 5.    Qualified Immunity

Police officers are immune from liability in § 1983 in suits brought against them in their

individual capacities if "their conduct does not violate clearly established statutory or constitutional

rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818

(1982).  The Second Circuit has explained that "[e]ven where the plaintiff's federal rights and the scope of the official's permissible conduct are clearly established, the qualified immunity defense protects a government actor if it was 'objectively reasonable' for him to believe that his actions were lawful at the time of the challenged act." *Lennon v. Miller,* 66 F.3d 416, 420 (2d Cir. 1995) (quoting *Anderson v. Creighton,* 483 U.S. 635, 641 (1987)); *see also Weyant*, 101 F.3d at 857 ("[P]ublic officials are entitled to qualified immunity if (1) their conduct does not violate clearly established constitutional rights, or (2) it was objectively reasonable for them to believe their acts did not violate those rights."). "A police officer's actions are objectively unreasonable, and therefore are not entitled to immunity, when 'no officer of reasonable competence could have made the same choice in similar circumstances.'" *Anthony v. City of New York,* 339 F.3d 129, 138 (2d Cir. 2003) (quoting *Lennon,* 66 F.3d at 420–21).

Where conflicting versions of the facts exist, an officer is entitled to qualified immunity only if "the *undisputed facts* and all permissible inferences favorable to the plaintiff show . . . that officers of reasonable competence could disagree on whether the probable cause test was met." *Robison v. Via,* 821 F.2d 913, 921 (2d Cir. 1987) (emphasis added).  Here, none of the alleged facts material to each of Garnett's surviving claims – i.e., Garnett's alleged role as a "lookout" prior to the transaction, the presence of Garnett inside the store, and his incriminating statements to Roper and Cintron – is undisputed.  If a jury therefore chose to credit Garnett's version of the facts, it follows that no reasonable officer could have believed that there was probable cause for Garnett's arrest and prosecution, that it was reasonable to fabricate or misrepresent almost all of the material testimony and evidence relating to Garnett, or that it was reasonable not to intervene to prevent an arrest and prosecution that clearly lacked probable cause.

Because all of these rights were clearly established at the time, UC 0039 is not entitled to qualified immunity as to Garnett's false arrest, malicious prosecution, and denial of his right to fair

trial claims, and UC 0243 is not entitled to qualified immunity on Garnett's failure to intervene claim. *See Stewart v. City of New York*, No. 06 Civ. 15490, 2008 WL 1699797, at *11 (S.D.N.Y. Apr. 9, 2008) ("By the date of [plaintiff's] arrest, it was clearly established that an individual has a right not to be arrested or prosecuted without probable cause. Accordingly, it would have been objectively unreasonable for [the defendant officer] to assist in the arrest and prosecution of [plaintiff] unless he had reason to believe that [plaintiff] had participated in a drug transaction. Because a reasonable jury could accept [plaintiff's] claim that he played no role in the drug transaction, and that there consequently was no probable cause, [the defendant officer] is not entitled to summary judgment on the basis of qualified immunity.") (false arrest); *Jovanovic v. City of New York*, No. 04 Civ. 8437, 2006 WL 2411541, at *13 (S.D.N.Y. Aug. 17, 2006) ("Any reasonable officer would have known that [Plaintiff's] rights would be violated by fabricating evidence and making false statements to prosecutors and the jury. Accordingly, to the extent that [the defendant officer] actually committed the wrongs alleged in Plaintiff's complaint, qualified immunity will not protect him from suit.") (malicious prosecution); *Ricciuti,* 124 F.3d at 130 ("The right to a fair trial was also clearly established at the time of the incident.") (denial of a right to fair trial); *Caceres v. Port Auth. of New York & New Jersey*, No. 06 Civ. 1558, 2008 WL 4386851, at *8 (S.D.N.Y. Sept. 24, 2008) ("Because there remain genuine issues of material fact as to whether the defendants violated the plaintiff's constitutional rights, there also remain genuine issues of material fact as to whether the defendants had a duty to intervene.") (failure to intervene).

## III.   Conclusion

For the reasons stated above, the Court denies defendants' summary judgment motion on Garnett's false arrest, malicious prosecution, and denial of his right to fair trial claims against UC 0039 and his failure to intervene claim against UC 0243, and grants summary judgment in favor of

UC 0243 on Garnett's false arrest, malicious prosecution, and denial of a right to fair trial claims.

The Clerk of Court is directed to terminate the motion at docket number 38.

      SO ORDERED.


Dated:  August 13, 2014
New York, New York

                                                            GREGORY H. WOODS
                                        United States District Judge