UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
KWAME GARNETT,

                             Plaintiff,

            -against-

UNDERCOVER OFFICER C0039 and UNDERCOVER
OFFICER C0243,

                            Defendants.
------------------------------------------------------------------x

**DECLARATION OF ROBERT T. PERRY IN SUPPORT OF MOTION FOR ATTORNEY'S FEES AND COSTS**

13 Civ. 7083 (GHW) (JLC)

      ROBERT T. PERRY declares, pursuant to 28 U.S.C. § 1746, under penalty of perjury, as follows:

      1.    I am the attorney for plaintiff Kwame Garnett in the above-captioned action and as such, am familiar with the facts and circumstances concerning the prosecution of this action. I submit this declaration in support of plaintiff's motion pursuant to Rule 54(d)(2) of the Federal Rules of Civil Procedure and 42 U.S.C. § 1988 for an order awarding plaintiff attorney's fees and other discretionary costs as the prevailing party on his denial of fair trial claim.

      2.    Plaintiff seeks compensation for counsel time expended and expenses incurred on this case, including in preparing this fee application, through the date of the application. To the extent that counsel is required in the future to expend additional time or incur additional expenses on the fee application or other matters arising from this litigation, plaintiff will provide the Court with supplemental documentation.

      3.    In preparing this fee application, plaintiff has excluded counsel time devoted solely to plaintiff's false arrest and malicious prosecution claims against Undercover Officer C0039 ("UC 0039") and failure to intervene claim against Undercover Officer C0243 ("UC 0243"). Plaintiff reserves the right to seek compensation for that work in the event that a new trial is granted and plaintiff succeeds on those claims.

## ATTORNEY BACKGROUND AND EXPERIENCE

4. I am a 1974 graduate of Columbia Law School, where I was a Harlan Fiske Stone scholar. I received my undergraduate degree a combined bachelor of arts and bachelor of science in electrical engineering from Brown University in 1969, where I graduated Magna Cum Laude With Honors. I also received a masters degree in electrical engineering from Brown University in 1971.

5. From September 1974 to August 1976, I was an attorney in the Common Carrier Bureau of the Federal Communications Commission ("FCC"), where I was a principal author of the FCC's decision permitting resale and sharing of telephone service for the first time (since the late nineteenth century). *Regulatory Policies Concerning Resale and Shared Use of Common Carrier Services and Facilities*, 60 FCC 2d 261 (1976), *on recon*, 62 FCC 2d 588 (1977), *aff'd sub. nom.*, *American Telephone and Telegraph Co. v. FCC*, 572 F.2d 17 (2d Cir.), *cert. denied*, 439 U.S. 875 (1978). I received an award for outstanding achievement from the FCC for that work.

6. From August 1976 to September 1978, I was a trial attorney with the Legal Aid Society of the City of New York, representing indigent clients in welfare, housing, and consumer matters in New York State courts, including in the first challenge to the failure of welfare shelter allowances to include cost-of-living increases.

7. From October 1978 to January 1981, I was a general attorney with the National Telecommunications and Information Administration, where I drafted Executive Branch comments to the FCC and Executive Branch testimony to Congress on telecommunications and information policy issues, including a proposed redefinition of the "common carrier" concept under Title II of the Communications Act of 1934, as amended, 47 U.S.C. §§ 201 *et seq.*, to stress monopoly control of essential services or facilities before imposing economic regulation.

8. From January 1981 to September 1982, I was an assistant attorney general in the antitrust bureau of New York Attorney General Robert Abrams, where I drafted the Attorney

2

General's proposed cable television privacy legislation. *Bill Seeks to Safeguard Cable Viewers' Privacy*, N.Y. Times, Jan. 12, 1982, at B3; *Just Between Us Cables*, N.Y. Times, Feb. 16, 1982, at A18. I also represented the Attorney General on the brief and in oral argument in the New York Court of Appeals in *Capitol Telephone Co. v. Pattersonville Telephone Co.*, 56 N.Y.2d 11 (1982) (concerning the relationship between state antitrust law and state regulation of telephone companies).

9. From October 1982 to December 1984, I was Special Counsel on Telecommunications to the New York State Legislative Commission on Science and Technology ("LCST"), where I advised state legislators on telecommunications and information policy issues, drafted LCST commentary on telecommunications policy issues, *see, e.g., A Gap-Toothed Bill on Two-Way Cable Privacy*, N.Y. Times, June 23, 1983, at A22, and represented a group of state legislators in an unsuccessful legal challenge to the splitting of the New York City area code.

10. From January 1985 to May 1989, I was a clinical associate professor at New York Law School, where I co-taught the Media Law Clinic, supervising law student involvement and acting as lead attorney in media-related public interest litigation. *See* ¶¶ 11-15 *infra*.

11. I represented cable television subscribers in lower Manhattan in an antitrust lawsuit against Time, Inc., Home Box Office, and Manhattan Cable TV, Inc. ("MCTV"), challenging MCTV's refusal to carry unaffiliated movie-oriented pay services. After the Honorable Robert W. Sweet denied the defendants' motion to dismiss, *New York Citizens Committee on Cable TV v. Manhattan Cable TV, Inc.*, 651 F. Supp. 802 (S.D.N.Y. 1986), the parties entered into a settlement, with MCTV agreeing to carry Bravo. *How Manhattan Cable Agreed to Pick Up Bravo*, N.Y. Times, Mar. 26, 1988, at 58; *Professor Gets the Better of Cravath*, Manhattan Lawyer, Jan. 5, 1988, at 4. Former United States Senator Howard M. Metzenbaum, then Chairman of the United States Senate Subcommittee on Antitrust, Monopolies, and Business Rights, described that single lawsuit brought by myself and several law students as "more antitrust enforcement action against the vertically

3

integrated cable monopolies than we saw either from the Justice Department or the Federal Trade Commission during the entire decade of the 1980's." H. Metzenbaum, *Telecommunications Policy: Protecting Consumers by Promoting Diversity*, 25 N.Y.L.S. L. Rev. 619, 625 (1990).

12. I represented the American Civil Liberties Union ("ACLU") in an unsuccessful challenge to the FCC's 1985 deregulation of basic cable service, acting as the ACLU's lead counsel in that litigation. *ACLU v. FCC*, 823 F.2d 1554 (D.C. Cir. 1987), *cert. denied*, 485 U.S. 959 (1988). I wrote the ACLU's briefs on the merits and did the oral argument in the District of Columbia Circuit. I was also the attorney of record on, and primary author of, a petition for writ of certiorari jointly filed in the United States Supreme Court by the ACLU, State of Connecticut, National League of Cities, and City of New York.

13. I represented public interest groups in various legal challenges to FCC rulings in the District of Columbia and Second Circuits. *See, e.g., National Black Media Coalition v. FCC*, 791 F.2d 1016 (2d Cir. 1986) (co-author of briefs and oral argument for NBMC in successful challenge to FCC's repeal of minority broadcast ownership policies); *Carlin Communications, Inc. v. FCC*, 837 F.2d 546 (2d Cir.) (amicus curiae brief and oral argument for New York Civil Liberties Union, persuading court to direct FCC to reconsider "V-chip" proposal for limiting children's access to dial-a-porn services, as less restrictive alternative to complete ban on dial-a-porn services), *cert. denied*, 488 U.S. 924 (1988); *Syracuse Peace Council v. FCC*, 867 F.2d 654 (D.C. Cir. 1989) (unsuccessful challenge to FCC's repeal of broadcast fairness doctrine; co-author of main brief on "chilling effect" issue).

14. I represented public interest groups in administrative litigation before the FCC, including a successful license renewal challenge on behalf of a San Francisco citizen group against one of the nation's largest public broadcasters. *KQED*, 2 FCC Rcd 352 (I.D. 1987) (granting renewal of VHF, UHF, and AM stations), *aff'd in part and rev'd in part*, 3 FCC Rcd 2821 (Rev. Bd. 1988) (denying renewal of UHF station license and awarding license to minority group), *aff'd*, 3 FCC

Rcd 2601 (1989), *aff'd sub nom.*, *California Public Broadcasting Forum v. FCC*, 947 F.2d 505 (D.C. Cir. 1991). I acted as second counsel during pre-hearing discovery and at the two-week license renewal hearing and co-authored the briefs through the administrative appeals. I also represented the ACLU before the FCC in opposing the CIA's 1985 broadcast fairness complaint against ABC (in connection with an ABC report that the CIA had sought the assassination of a Honolulu investment counselor) and seeking a declaration that the First Amendment bars government agencies such as the CIA from filing broadcast fairness complaints. *CIA v. ABC*, 58 Rad. Reg. 2d (P&F) 1544 (1985).

15. I was the principal consulting attorney to the Alabama Civil Liberties Union in the first obscenity case involving allegedly obscene 2 Live Crew recordings, the Alabama prosecution of Alexander City record retailer Tommy Hammond, who was defended by the Alabama Civil Liberties Union. *See Tape Obscenity Conviction Is Upset*, N.Y. Times, Feb. 23, 1990, at C19. I selected and prepared the key expert witnesses on the serious literary, artistic and political value of 2 Live Crew's music -- music critic John Leland and African American Rhodes Scholar Carlton Long -- both of whom also testified in the later Florida litigation involving allegedly obscene 2 Live Crew music.

16. From May 1989 to January 1992, I was Assistant Director for Legal Research in the Legal Division of the New York City Council, where I co-authored the Council's amicus brief to the New York Court of Appeals in the City of New York's unsuccessful "home rule" challenge to a state law permitting a referendum on Staten Island's proposed secession from the City. *City of New York v. State of New York*, 76 N.Y.2d 479 (1990).

17. Since January 1992, I have been a sole practitioner primarily engaged in civil rights litigation involving not only the electronic media but also street artists and street musicians, post-9/11 issues, and police misconduct. I have often represented clients on a pro bono basis, without even the prospect of an attorney's fee award.

18. During the Supreme Court's October 1995 Term, I represented cable television public access producers and subscribers from New York City, one of three petitioner groups, in a partially successful First Amendment challenge to the federal censorship scheme for indecent leased and public access programming adopted by Congress in 1992. *Denver Area Educational Telecommunications Consortium, Inc. v. FCC*, 518 U.S. 727 (1996) (upholding provision permitting cable operators to prohibit indecent programming on leased access channels but declaring provision permitting cable operators to prohibit indecent programming on public access channels unconstitutional). In a brief for the "New York City Petitioners" (on which a former student assisted me), I urged the Court to recognize the public forum status of public access channels, notwithstanding the private ownership of most cable television systems -- with partial success. *See id.* at 742-43 (Breyer, J., plurality op.) (declining to decide whether public access channels were designated public fora); *id.* at 791 (Kennedy, J., concurring in part and dissenting in part) (finding public access channels to be designated public fora); *id.* at 826-29 (Thomas, J., concurring in part and dissenting in part) (finding public access channels not designated public fora). The brief also persuaded most Justices to acknowledge that public forum analysis applies, at least under some circumstances, to private property (*see id.* at 742, 791, 828), just four years after the Court had stated -- in dictum -- that public forum analysis was "irrelevant" to bus and rail terminals because they "traditionally have had *private* ownership." *International Society for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672, 681 (1992) (italics in original).

19. I successfully defended a cable public access producer sued by the ASPCA -- represented by Proskauer Rose Goetz & Mendelsohn LLP -- for libel and trademark infringement in connection with her weekly cable public access show "Eye on the ASPCA." *American Society for Prevention of Cruelty to Animals v. French*, No. 94 Civ. 5621 (S.D.N.Y. May 20, 1996) (Leisure, J.) (adopting Magistrate Michael H. Dolinger's report and recommendation denying the ASPCA's

6

motion for summary judgment and granting in part the defendant's motion for summary judgment, holding that defendant's use of the ASPCA trademark in the title of her show was protected by the First Amendment). Following denial of its summary judgment motion, the ASPCA voluntarily dismissed the case.

20. I represented Media Access New York ("MANY") on an amicus brief and in oral argument in the Second Circuit, persuading the court to vacate the dismissal of a public access producer's pro se lawsuit against a cable operator who had censored her programming. *Glendora v. Cablevision Systems Corp.*, 45 F.3d 36 (2d Cir. 1995). On remand, I persuaded the district court to rule that the producer had an implied right of action under 47 U.S.C. § 531(e) to enforce the statutory prohibition on a cable operator's exercise of editorial control over public access channels. *Glendora v. Cablevision Systems Corp.*, 893 F. Supp. 264 (S.D.N.Y. 1995). I had first argued that there was an implied right of action under 47 U.S.C. § 531(e) while assisting the ACLU in representing several controversial public access producers in a successful First Amendment challenge to Kansas City's elimination of the local public access channel in the late 1980's. *Missouri Knights of Ku Klux Klan v. Kansas City, Mo.*, 723 F. Supp. 1347 (W.D. Mo. 1989) (recognizing implied right of action under 47 U.S.C. § 531(e)). The Second Circuit finally recognized such a right in *McClellan v. Cablevision of Connecticut*, 149 F.3d 161 (2d Cir. 1998), relying in part on points that I made in another amicus brief for MANY. *See id.* at 166 (observing that Congress re-enacted 47 U.S.C. § 531(e) following widespread press coverage of the *Missouri Knights* case, as I noted in MANY's amicus brief).

21. I represented unlicensed low power FM radio stations in two unsuccessful First Amendment challenges to federal restrictions on microbroadcasting, acting as lead counsel in one case and orally arguing both cases in the Second Circuit. *See Prayze FM v. FCC*, 214 F.3d 245 (2d Cir. 2000); *Free Speech ex rel. Ruggiero v. Reno*, 200 F.3d 63 (2d Cir. 1999). I also represented a former unlicensed microbroadcaster in the District of Columbia Circuit in a First Amendment challenge to

the automatic and permanent ban on eligibility of unlicensed microbroadcasters for newly authorized low power FM radio broadcast licenses. A divided panel in the District of Columbia Circuit declared the ban unconstitutional but the en banc circuit court vacated the panel's decision and upheld the ban. The Supreme Court denied review. I wrote the briefs, did three oral arguments, including the en banc argument, and was the attorney of record on the petition for writ of certiorari. *See Ruggiero v. FCC*, 278 F.3d 1323 (D.C. Cir. 2002), *vacated*, 317 F.3d 239 (D.C. Cir.) (en banc), *cert. denied*, 540 U.S. 813 (2003).

22.    I represented street musician Robert Turley in a First Amendment challenge to a ban on unsponsored amplified music in Times Square and Central Park. Following a six-day trial before the Honorable Shira A. Scheindlin in May 1997 involving testimony from a number of police officers, a jury awarded Mr. Turley $35,000 in damages. Judge Scheindlin granted a partial new trial. On the eve of the new trial, the parties settled the damages claim, with the City of New York agreeing to pay $150,000 to Mr. Turley. Following a two-day bench trial, Judge Scheindlin declared the $45 fee for a daily sound device permit unconstitutional. The Second Circuit reversed on the latter issue. *See Turley v. New York City Police Dep't*, 988 F. Supp. 667 & 675 (S.D.N.Y. 1997), *aff'd in part and rev'd in part*, 167 F.3d 757 (2d Cir. 1999).

23.    I successfully defended street artists in the New York County District Attorney's appeal from the dismissal of criminal charges for vending art in front of the Metropolitan Museum of Art without a general vendor's license. *People v. Balmuth*, 189 Misc.2d 243 (App. Term 1st Dep't) (affirming dismissal), *leave to appeal denied*, 97 N.Y.2d 678 (2001).

24.    From 1997 to 1999, I worked part-time for Norwick & Schad, a small copyright and libel law firm, drafting summary judgment motions for the Russian language newspaper Novoye Russo Slovo in libel lawsuits brought by an emigre author and an NHL player agent, a motion to dismiss for Angel Records in a copyright and trademark infringement lawsuit involving "Chant," the

best-selling album recorded by Benedictine Monks, and a reply brief for Playboy in the Second Circuit in the long-running dispute between Playboy and Patrick Nagel's widow over copyright ownership in Nagel's artwork.

25.     From 1998 to 2004, I had an office at the Center for Constitutional Rights ("CCR"), where, besides representing street artists and unlicensed microbroadcasters (*see* ¶¶ 21, 23 *supra*), I defended the civil rights of Muslims citizens and non-citizens. I represented Muslim firefighters and emergency medical technicians in a challenge to the Fire Department of the City of New York's refusal to appoint a Muslim chaplain. *Islamic Society of Fire Department Personnel v. City of New York*, 205 F. Supp.2d 75 (E.D.N.Y. 2002) (dismissing plaintiffs' Title VII claim but declining to dismiss their Establishment Clause claim). I was the principal author of the complaint in *Turkmen v. Ashcroft*, 02 Civ. 2307 (E.D.N.Y. filed April 17, 2002), a class action lawsuit on behalf of Muslim non-citizens indefinitely detained after September 1, 2001 on minor immigration violations. I was also a principal author of the complaint in *Arar v. Ashcroft*, 04 Civ. 0249 (E.D.N.Y. filed Jan. 22, 2004), the first challenge to the federal government's "extraordinary rendition" policy, brought on behalf of a Canadian national detained at JFK International Airport and flown to Syria for interrogation under torture.

26.     I co-authored CCR's brief for the respondent-appellant citizen groups in the New York Court of Appeals in the successful challenge to Mayor Giuliani's attempt to privatize public hospitals, writing that part of the brief discussing the legislative history of the Health and Hospitals Corporation Act. *Council of the City of New York v. Giuliani*, 93 N.Y.2d 60 (1999).

27.     After leaving CCR, I represented a Muslim mechanic discharged from employment with a Merrill Lynch contractor after September 11, 2001, for disputing "true Muslim" involvement in the 9/11 terrorist attacks, acting as lead counsel, conducting all the depositions, drafting plaintiff's opposition to defendants' motion for summary judgment, and preparing for the jury trial. *See*

9

*Muslim's Bias Suit Over Dismissal Is Kept Alive*, N.Y.L.J., Dec. 2, 2004, at 1; *Pjetrovic v. Merrill Lynch & Co., Inc.*, No. 2003 Civ. 6605 (HB), 2004 WL 2725993 (S.D.N.Y. Nov. 30, 2004) (denying defendants' motion for summary judgment). The parties settled the case on the eve of trial.

28. Since May 2003, I have represented hundreds of indigent defendants in misdemeanors cases in New York City Criminal Court on an assigned counsel basis, including in three jury trials. I also acted as second seat in two murder jury trials. I have also represented indigent defendants who have been convicted on appeals in New York State courts.

29. Since 2008, I have increasingly focused my practice on civil rights actions on behalf of individuals who have been falsely arrested and maliciously prosecuted by police officers in New York City. For several years, I assisted Leventhal & Klein, LLP, a well-respected civil rights law firm, in their significant police misconduct litigation. Today, I devote approximately 75% of my time to my own police misconduct litigation. To date, I have worked on over 50 police misconduct cases, including 30 cases in which I have acted as lead counsel. The latter cases include a "false confession" case settled for $215,000.

30. I typically represent my clients in civil rights cases on a contingency fee basis, as most of them cannot even afford to reimburse my expenses out of their pockets. I am compensated either through a percentage of the settlement or an award of attorney's fees and costs.

31. I bear all the costs of litigation while a case is pending and have always released my client from any obligation to reimburse my litigation expenses in the infrequent event that there is no recovery.

32. Civil rights cases involving police misconduct are extremely risky, time-consuming ventures for an attorney, as this case amply demonstrates. They can also be highly complex, as this case also shows -- sometimes as complex as the antitrust, copyright, freedom of speech, and telecommunications cases that I formerly litigated.

10

33. As an adjunct assistant professor of law at New York Law School from 1983 through 2003, I taught or co-taught courses on antitrust law (1983-1988), telephone regulation (1983-1984), cable television (1988-1992), and telecommunications policy (2003).

34. Between 1990 and 1996, I was an adjunct professor in the Interactive Telecommunications Program at New York University's Tisch School of the Arts, where I taught courses on freedom of speech, copyright and new media, and domestic and international telecommunications policy.

35. I have published articles on First Amendment issues involving cable televisions, broadcasting, hip hop music, and street musicians in the New York Law Journal and Washington Legal Times. *See, e.g.,* B. Olshansky & R. Perry, *Go Ahead, Steal This Radio: FCC Squelching of 'Pirate' Stations Violates First Amendment*, Wash. Legal Times, May 17, 1999, at 18; B. Graifman & R. Perry, *'Denver Area' Reveals Struggle Over Free Speech in New Media*, N.Y.L.J., Aug. 16 and 23, 1996, at 5; R. Perry, *The Legal History of Street Musicians in New York*, N.Y.L.J., Dec. 22 and 29, 1995, at 5; R. Perry & C. Long, *Obscenity Law, Hip Hop and 2 Live Crew*, N.Y.L.J., July 13 & 20, 1990, at 5.

36. I am a member of the New York, Massachusetts, and District of Columbia bars. I am also a member of the bars of the United States District Courts for the Southern and Eastern Districts of New York, the United States Courts of Appeals for the Second and District of Columbia Circuits, and the United States Supreme Court.

## THE PRIOR PROCEEDINGS

37. Plaintiff was arrested on November 19, 2011 at about 6:30 p.m. inside an electronics store at 1870 Lexington Avenue in East Harlem, in connection with a buy-and bust narcotics transaction across the street, inside a bodega at 1865 Lexington Avenue, at about 6:20 p.m. that evening. Two days later, on November 21, 2011, in the Criminal Court of the City of New York, New York County, plaintiff was arraigned and charged with criminal sale of a controlled substance

in the third degree and criminal sale of marijuana in the fourth degree Bail was set at $50,000. On November 25, 2011, plaintiff was indicted on the charged crimes. On July 6, 2012, a jury acquitted plaintiff of all charges, and plaintiff was released, after nearly eight months in custody.

38. In late August 2012, following his acquittal and release from custody, plaintiff retained me to represent him in a civil lawsuit to seek money damages for the injuries suffered as a result of his arrest and prosecution in connection with the buy-and-bust narcotics transaction on November 19, 2011. In early September 2012, I requested copies of the criminal case file from the New York State Supreme Court-Criminal Term in New York County, and upon receipt in October 2012, I reviewed those records. The filing of plaintiff's lawsuit, however, was delayed due to uncertainties arising from plaintiff's new arrest in November 2012 and subsequent prosecution and conviction.

39. On October 4, 2013, I filed the complaint in this action. On November 20, 2013, before plaintiff's time to amend the complaint as of right had expired, defendants moved to dismiss the complaint on all claims, except the false arrest claim against UC 0039. On December 9, 2013, plaintiff timely filed an amended complaint. On December 20, 2013, defendants moved to dismiss the amended complaint on all claims, except the false arrest claim against UC 0039. On February 10, 2014, the Court (Hon. Jed S. Rakoff) granted in part and denied in part defendants' motion to dismiss.

40. The parties thereafter conducted discovery, including six depositions, in February 2014. On March 27, 2014, defendants moved for summary judgment. On August 14, 2014, the Court (Hon. Gregory H. Woods) granted in part and denied in part defendants' motion. Defendants then moved for reconsideration, which the Court denied on October 14, 2014.

41. The case proceeded to trial on Monday, November 17, 2014 on plaintiff's false arrest, malicious prosecution, and denial of fair trial claims against UC 0039 and plaintiff's failure to

intervene claim against UC 0243. On Friday, November 21, 2014, the jury found in defendants' favor on plaintiff's false arrest and malicious prosecution claim against UC 0039 and his failure to intervene claim against UC 0243 but found for plaintiff on his denial of fair trial claim against UC 0039, awarding plaintiff nominal damages in the amount of $1 and punitive damages in the amount of $20,000.

## COUNSEL'S WORK ON THIS CASE

42. As plaintiff's sole attorney throughout this litigation from intake in August 2012 to the present, I obtained and reviewed the criminal case file, drafted the complaint, drafted plaintiff's memorandum of law in opposition to defendants' first motion to dismiss, drafted plaintiff's amended complaint, drafted plaintiff's memorandum of law in opposition to defendants' second motion to dismiss, and presented oral argument in opposition to defendants' second motion to dismiss.

43. I drafted the motion to unseal the grand jury minutes, propounded and responded to discovery requests, took depositions of four police officers, defended plaintiff at his deposition, and attended non-party witness Naim Roper's deposition.

44. I drafted plaintiff's memorandum of law in opposition to defendants' motion for summary judgment and plaintiff's response to defendants' Local Civil Rule 56.1 statement, presented oral argument in opposition to the motion, and drafted plaintiff's memorandum of law in opposition to defendants' motion for reconsideration of the Court's decision partially granting and partially denying summary judgment.

45. I drafted plaintiff's motions in limine, drafted plaintiff's opposition to defendants' motions in limine, drafted plaintiff's portion of the proposed joint pre-trial order, drafted plaintiff's additions to the proposed joint jury charges, drafted plaintiff's proposed voir dire questions, drafted

plaintiff's proposed special verdict questions, and represented plaintiff at the two pre-trial conferences in October 2014.

46. I undertook considerable efforts to ensure plaintiff's production for trial, prepared for the trial, and conducted the trial, including, among other things, jury selection, opening statements, witness examinations, charging conference, and summations.

47. I drafted plaintiff's motion for a new trial, drafted plaintiff's opposition to defendants' post-trial motions, and drafted this motion for attorney's fees and costs.

48. I consulted numerous times with plaintiff in person, over the telephone, and through the mail, often under trying circumstances due to his re-incarceration.

## NUMBER OF HOURS EXPENDED

49. Plaintiff seeks compensation for 518.7 hours of legal work, 20.0 hours of travel time, and 26.8 hours of administrative work.

50. This represents work done on this litigation to date, including work that was done prior to the verdict and work that has been done post-verdict, as well as work done on this fee application.

51. Attached as Exhibit A are my accurate, detailed, and contemporaneous time records for this litigation. I have redacted entries for work done for other clients unrelated to this litigation.

52. Plaintiff does not seek compensation for all the hours listed in these records (Exhibit A) but instead seeks compensation only for the hours listed on the chart attached as Exhibit B.

53. All of the hours set forth in Exhibit B were reasonable and necessary to represent plaintiff in this case.

54. As already noted (*see* ¶ 3 *supra*), plaintiff does not seek compensation for work devoted solely to plaintiff's false arrest and malicious prosecution claims against UC 0039 and failure

to intervene claim against UC 0243. Plaintiff, however, reserves the right to seek compensation for that work in the event that a new trial is granted and plaintiff succeeds on those claims.

55.     Plaintiff does not seek compensation for work devoted solely to dismissed claims and parties.

56.     Plaintiff seeks compensation for 80% of the work that cannot be attributed to any particular claim because it was impossible or impractical to do so. *Cf. Green v. Torres*, 361 F.3d 96, 100 (2d Cir. 2004) (per curiam) (20% reduction for such work).

## REASONABLE HOURLY RATES

57.     Based on my extensive experience litigating complex cases ranging from antitrust to civil rights cases, including a number of police misconduct cases, in the federal district courts, in the federal courts of appeals, and in the United States Supreme Court, with some notable successes (*see* ¶¶ 4-28 *supra*), I respectfully request compensation at the rate of $400.00 per hour.

58.     Courts in the Southern District of New York have awarded the same or higher hourly rates to attorneys with comparable experience. *See, e.g., G.B. v. Tuxedo Union Free School District*, 894 F. Supp.2d 415, 432-33 (S.D.N.Y. 2012) ("the Court concludes that $450 per hour is a reasonable market rate for an attorney with over thirty years of civil rights litigation experience"); *Allende v. Unitech Design, Inc.*, 783 F. Supp.509, 514 (S.D.N.Y. 2011) (awarding partner, who graduated from law school in 2001, $450/hour and senior associate, who also graduated from law school in 2001, $300/hour in a Fair Labor Standards Act ("FLSA") case); *Kahlil v. Original Old Homestead Restaurant, Inc.*, 657 F. Supp.2d 470, 476 (S.D.N.Y. 2009) (awarding an attorney with roughly 25 years of experience "the unexceptional rate of $400 per hour" in a FLSA case involving "not particularly complex or unusual" issues); *Simmonds v. New York City Department of Correction*, No. 06 Civ. 5298 (NRB), 2008 WL 4303474, at *4-*5 (S.D.N.Y. Sept. 16, 2008) (awarding $425 per hour to ACLU

lead counsel and $425 per hour to senior law firm partner in Title VII case that "did not present any unusually complicated factual or legal issues").

59. The requested rate ($400 per hour) is presently the rate that I charge defendants when one of my clients in a civil rights action accepts an offer under Rule 68 of the Federal Rules of Civil Procedure and I must negotiate my fees with defendants.

60. Over 15 years ago, in the *Turley* litigation (*see* ¶ 22 *supra*), the court awarded me $277,000 in attorneys' fees (reduced to $212,000 after the Second Circuit reinstated the sound device permit fee declared unconstitutional by Judge Scheindlin) based on a $250 per hour rate -- a rate that I requested at the time and now believe to have been too low even then. In any event, having 15 more years of litigation experience, including substantial police misconduct litigation experience, I respectfully submit that a $400 per hour rate is appropriate.

## EXPENSES

61. Plaintiff also seeks compensation for nontaxable expenses in the amount of $3,011.41 to the date of this fee application.

62. Attached as Exhibit C is a list of plaintiff's nontaxable expenses with supporting documentation.

63. The expenses listed in Exhibit C were reasonably and necessarily incurred to represent plaintiff in this case.

64. Plaintiff does not seek compensation for expenses incurred solely in connection with dismissed claims or parties.

65. As the expenses listed in Exhibit C cannot be attributed cannot be attributed to any particular claim because it was impossible or impractical to do so, plaintiff seeks 80% compensation.

## CONCLUSION

66.     For the reasons set forth above and in the accompanying memorandum of law, plaintiff respectfully requests that the Court grant an order awarding plaintiff: $216,840 in attorney's fees and $3,011.41 in costs.

Dated: Brooklyn, New York
       February 28, 2015

/s/
_____
Robert T. Perry
45 Main Street, Suite 230
Brooklyn, New York 11210
(212) 219-9410
*Attorney for Plaintiff*

TO:     BY ECF AND FIRST CLASS MAIL
        Matthew J. Modafferi, *Senior Counsel*
        James F. Horton, *Assistant Corporation Counsel*
        *Attorneys for Defendants Undercover Officer C0039*
           *and Undercover Officer C0243*