15-1489 (L)
Garnett v. Undercover Officer C0039, et al.

1                 UNITED STATES COURT OF APPEALS
2                    FOR THE SECOND CIRCUIT
3                   _____

4                       August Term, 2015

5   (Argued: June 7, 2016               Decided: September 30, 2016)

6           Docket Nos. 15-1489 (Lead), 15-1500 (XAP)

7                   _____

8   KWAME GARNETT,

9                 *Plaintiff-Appellee-Cross-Appellant*,

10        v.

11   UNDERCOVER OFFICER C0039, Individually and In his official capacity,

12               *Defendant-Appellant-Cross-Appellee*,

13   UNDERCOVER OFFICER C0243, Individually and In his official capacity,

14                  *Defendant-Appellee*,

15   CITY OF NEW YORK, NEFTALI BETANCES, Individually and In his official
16   capacity, KEITH CARPENTER, Individually and In his official capacity, ABEL
17   JOSEPH, Individually and In his official capacity, ERICK ORTIZ, Individually
18   and In his official capacity, CARLOS SIERRA, Individually and In his official
19   capacity, TYRONE VIRUET, Individually and In his official capacity, JOHN
20   DOES, Nos. 1-10, Individually and In their official capacity (the names John and

Jane Doe being fictitious, as the true names are presently unknown), JANE
DOES, Nos. 1-10, Individually and In their official capacity, (the names John and
Jane Doe being fictitious, as the true names are presently unknown),

*Defendants.*

_____

Before: POOLER, SACK, and LYNCH, *Circuit Judges*.

Appeal from United States District Court for the Southern District of New
York (Gregory H. Woods, *J.*) denying defendant-appellant-cross-appellee
Undercover Officer C0039's ("UC 39") motion for judgment as a matter of law
and denying plaintiff-appellee-cross-appellant Kwame Garnett's motion for a
new trial. Garnett was arrested by UC 39 during a "buy and bust" and was
subsequently charged based on UC 39's account of his observations of the
alleged crime, including a statement UC 39 attributed to Garnett. Garnett denied
making the statement and, after being held for nearly eight months pending trial,
was acquitted at a state criminal trial. Garnett subsequently filed a Section 1983
action bringing various claims against UC 39, among others. After a civil trial
before the district court, UC 39 was found liable for violating Garnett's
constitutional right to a fair trial. In its post-trial rulings, the district court held
UC 39's account of his personal observations of the incident, which gave rise to

2

1    Garnett's arrest, could provide the basis for a claim of denial of the right to a fair

2    trial due to an officer's provision of false information to a prosecutor following

3    *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123 (2d Cir. 1997), and therefore

4    denied UC 39's motion for judgment as a matter of law. The district court also

5    denied Garnett's motion for a new trial after finding that the court's jury

6    instruction on probable cause, following the jury's request for clarification, was

7    an accurate statement of law and answered the jury's question. Because we are of

8    the view that *Ricciuti* controls when the fabricated information at issue is an

9    officer's account of his or her observations of alleged criminal activity which he

10   or she conveys to prosecutors, and also are of the view that the district court's

11   jury instruction was proper, we affirm.

12          Affirmed.

13                          _____

14          ROBERT T. PERRY, Brooklyn, NY, *for Plaintiff-Appellee-*
15          *Cross-Appellant Kwame Garnett*.

16          RICHARD DEARING, of counsel (Cecilia Chang, Ingrid
17          R. Gustafson, *on the brief*), *for* Zachary W. Carter,
18          Corporation Counsel of the City of New York, New
19          York, NY, *for Defendant-Appellant-Cross-Appellee*

1               *Undercover Officer C0039 and Defendant-Appellee*

2                *Undercover Officer C0243.*

3 POOLER, *Circuit Judge*:

4       Both plaintiff-appellee-cross-appellant Kwame Garnett and defendant-

5 appellant-cross-appellee Undercover Officer C0039's ("UC 39") appeal from a

6 judgment, entered after a jury trial in the United States District Court for the

7 Southern District of New York (Gregory H. Woods, *J.*), finding UC 39 liable for

8 denying Garnett his right to a fair trial by fabricating evidence in connection with

9 criminal charges against Garnett, and awarding Garnett $1 in nominal damages

10 and $20,000 in punitive damages. UC 39 argues that the district court erred in

11 denying his motion for judgment as a matter of law, and Garnett contends that

12 the court erred in denying his motion for a new trial.

13       Garnett was arrested by UC 39 in the wake of an undercover "buy and

14 bust" operation, and was subsequently charged based in part on UC 39's account

15 of his own observations during the alleged drug sale, including a statement he

16 said Garnett made during the transaction. Garnett denied making the statement

17 and, after being held for nearly eight months pending trial, was acquitted at a

18 state criminal trial. In its rulings following Garnett's civil jury trial, the district

4

1   court held that UC 39's allegedly fabricated account of his own observations

2   could provide the basis for a claim of denial of the right to a fair trial due to an

3   officer's provision of false information to a prosecutor following *Ricciuti v. N.Y.C.*

4   *Transit Authority*, 124 F.3d 123 (2d Cir. 1997), and therefore denied UC 39's

5   motion for judgment as a matter of law. The district court also denied Garnett's

6   motion for a new trial after finding that the court's jury instruction on probable

7   cause, following the jury's request for clarification, was an accurate statement of

8   law and answered the jury's question. Because we conclude that *Ricciuti* controls

9   when the fabricated information at issue is an officer's false account, conveyed to

10   prosecutors, of his or her own purported observations of alleged criminal activity

11   which led to an arrest, and that the district court's jury instruction was proper,

12   we affirm.

13        In *Ricciuti*, we held that, even if there is probable cause to arrest a

14   defendant, an officer who subsequently fabricates that defendant's confession

15   "and forwards that information to prosecutors . . . violates the accused's

16   constitutional right to a fair trial, and the harm occasioned by such an

17   unconscionable action is redressable in an action for damages under 42 U.S.C.

5

§ 1983." 124 F.3d at 130. This case calls for us to consider whether *Ricciuti*

requires the same result when the fabricated information at issue is the officer's

own account of his or her observations of alleged criminal activity which he or

she conveys to prosecutors. We hold that it does.

## BACKGROUND

### I.   Factual Background

#### A. Garnett's Arrest and Prosecution

This case arises from a so-called "buy and bust" operation conducted by

the New York City Police Department ("NYPD") on November 19, 2011. On that

evening, a team of NYPD officers, including defendant-appellant-cross-appellee

UC 39 and defendant-appellee Undercover Officer C0243 ("UC 243"), conducted

an operation in East Harlem where the undercover officers attempted to

purchase drugs.

There are commonly two roles in a "buy and bust" operation: the

"primary" tries to buy the drugs, while the "ghost" serves to protect the safety of

the primary. UC 39 was the ghost. UC 243, the primary, met non-parties Naquan

Cintron and Naim Roper. Roper was allegedly stating something along the lines

6

1    of "smoke, smoke, smoke" or "bud, bud, bud," and, at Roper's suggestion, the

2    undercover officers entered Lexington Grocery, a bodega, where Cintron and

3    Roper then sold small amounts of crack cocaine and marijuana to UC 243

4    sometime after 6:00 P.M. App'x at 251, 332. Cintron and Roper were then

5    arrested by other officers participating in the "buy and bust" operation.

6        Garnett was also arrested in connection with the drug sale. While UC 243

7    spoke with Cintron and Roper, UC 39 was scanning the area and stated that he

8    observed an individual, identified as Garnett, standing by the curb outside the

9    bodega. UC 39 testified that he saw Garnett also scanning the area.[1] UC 39 stated

10   that, based on his experience, he believed Garnett was keeping a lookout for

11   police during the sale. UC 39 wrote in a "DD-5," a complaint follow-up form,

12   and told the arresting officer and a prosecutor, that Garnett entered the bodega

13   during the sale and told Cintron and Roper, "Yo, hurry up. Y'all ain't done yet?

14   Get that money. I'm not looking to get locked up tonight. Let's go." App'x at 263-

15   64, 603. UC 243 heard Garnett speak, but did not hear exactly what Garnett had

[1] We note that UC 39 has testified regarding the circumstances leading to Garnett's arrest multiple times. Where not otherwise indicated, we draw these facts from his testimony at trial before the district court.

1    said. UC 39 testified that after he saw Garnett look at Roper and Cintron, Garnett

2    shook his head, and exited the bodega. This caused UC 39 to revise his earlier

3    theory that Garnett was a lookout for Roper and Cintron and instead to believe

4    that Garnett could be Roper's and Cintron's manager.

5    **B.  Roper and Cintron Plead Guilty; Garnett's Criminal Trial**

6          Six days after the arrests, Roper pled guilty in state court to one count of

7    criminal sale of marijuana in the fourth degree and one count of criminal

8    facilitation in the fourth degree. Cintron and Garnett were both indicted by a

9    state grand jury, but Cintron then pled guilty to one count of criminal sale of a

10   controlled substance (cocaine). In his plea allocution, Cintron stated that he acted

11   "in concert with" Garnett in selling "a narcotic drug to a police officer."[2] App'x at

12   781.

13         Garnett then proceeded to a state criminal trial. Prior to Garnett's criminal

14   trial, UC 39 communicated the information in UC 39's original DD-5 report to the

15   Assistant District Attorney prosecuting the case. UC 39 also explained that he

---

[2] This statement, however, was deemed inadmissible hearsay by the district court at Garnett's federal civil trial as Cintron was unavailable to testify after both parties were unable to locate him.

8

1   knew Garnett prior to the arrest at issue as, three years earlier, Garnett and two

2   other individuals attempted to rob UC 39 at gunpoint in a housing project where

3   officers were engaging in an investigation. Garnett, seventeen years old at the

4   time, was convicted of attempted robbery in the first degree. According to UC 39,

5   it was not until he learned Garnett's name after the arrest that he realized that

6   Garnett was the same person who had robbed him at gunpoint three years

7   earlier. UC 39 explained that he did not initially recognize Garnett during the

8   "buy and bust" operation because, during the earlier encounter, Garnett had

9   been three years younger, had looked younger and thinner, and had had "a lot of

10  hair on his head." App'x at 293. UC 39 was precluded from testifying about the

11  robbery during Garnett's state criminal trial.

12      Garnett has consistently denied having any involvement in the drug sale

13  and denies making the statement attributed to him by UC 39. After he was

14  arrested, Garnett was searched and no drugs, other contraband, or any other

15  evidence of criminal activity, were found on his person. Nevertheless, Garnett

16  was arraigned and charged with criminal sale of a controlled substance in the

17  third degree and criminal sale of marijuana in the fourth degree on the basis of

9

1    UC 39's communications with the prosecutor. Garnett pled not guilty and bail

2    was set at $50,000. Unable to post bail, Garnett remained in custody for nearly

3    eight months. On July 6, 2012, a jury acquitted Garnett of all charges and he was

4    released.

5        **C.  Garnett's Federal Damages Lawsuit**

6        On October 4, 2013, Garnett filed a lawsuit in the district court for the

7    Southern District of New York (Rakoff and Woods, *JJ.*). On December 9, 2013,

8    Garnett filed his amended complaint against officers involved in his arrest,

9    including UC 39 and UC 243, alleging, among other things, false arrest, malicious

10   prosecution, failure to intervene, and denial of the right to a fair trial under 42

11   U.S.C. § 1983. On December 20, 2013, defendants moved to dismiss all claims

12   except the false arrest claim and denial of the right to a fair trial claim against UC

13   39. On February 10, 2014, the district court (Jed S. Rakoff, *J.*) granted the motion

14   in part and denied it in part. The court dismissed all claims except: (1) the false

15   arrest claim against UC 39, UC 243, and two other officers, (2) the failure to

16   intervene claim against UC 243, (3) the malicious prosecution claims, under both

17   federal and state law, against UC 39 and UC 243, (4) the right to a fair trial claim

10

1    against UC 39 and UC 243, and two other state law claims not relevant to this

2    appeal.

3         On March 27, 2014, defendants moved for summary judgment. On April 8,

4    2014, the case was reassigned from Judge Rakoff to Judge Woods. On August 13,

5    2014, the district court (Gregory H. Woods, *J.*) granted the motion in part and

6    denied it in part, in particular denying summary judgment on Garnett's false

7    arrest, malicious prosecution, and fair trial claims against UC 39, and the failure

8    to intervene claim against UC 243. On October 14, 2014, the district court denied

9    defendants' motion for reconsideration.

10        **D. The Federal Damages Trial**

11        On November 17, 2014, the case proceeded to trial on those four claims. At

12   trial, Garnett testified on his own behalf and presented five additional witnesses

13   in his case-in-chief: UC 39, UC 243, Lieutenant Neftali Betances, Roper, and

14   Detective Tyrone Viruet. UC 39 and UC 243 adopted the testimony of the police

15   officer witnesses presented in Garnett's case and rested.

16        UC 39 testified, in relevant part, that Garnett entered Lexington Grocery

17   while Cintron, Roper, and UC 243 were conducting the "buy" transaction, at

11

1    which point Garnett gave UC 39 a "hard look" "[u]p and down." App'x at 255-

2    56. UC 39 testified that Garnett then spoke "sternly" to Cintron and Roper,

3    telling them to "hurry up, I'm not looking to get locked up tonight[.]" App'x at

4    256. After Garnett spoke, UC 39 testified that Garnett looked "upset" and that

5    Roper and Cintron "began to move quicker and they seemed, after his statement,

6    nervous, and they seemed to have been taking [Garnett's] direction, his order."

7    App'x at 256-57. This led UC 39 to testify that he believed Garnett was the

8    "manager of the transaction." App'x at 257.

9        Despite UC 39 testifying that Garnett told Roper and Cintron to "hurry

10   up," UC 39 went on to testify that Garnett went to the counter in the bodega to

11   conduct a transaction. That testimony was inconsistent with the testimony UC 39

12   had given before the grand jury. At Garnett's civil trial, UC 39 was confronted

13   with his grand jury testimony where he stated that Garnett went to the counter

14   *before* "turn[ing] around" and saying to Cintron and Roper, "Yo, hurry up. What

15   the hell is taking so long? I'm not trying to go back to jail. Get that money, get

16   that money, let's go." App'x at 257-58. UC 39 then testified that, after conducting

12

1    some sort of transaction at the counter, Garnett looked back at UC 39, exited the

2    store, crossed the street, and entered an audio/video store.

3        For his part, UC 243 testified that he did not notice Garnett outside the

4    bodega, that UC 39 did not alert him to Garnett's presence, and that he did not

5    see Cintron or Roper make eye contact with a third person outside the store. UC

6    243 did testify that he saw Garnett enter the store and say something. After being

7    presented with his grand jury testimony, UC 243 also testified that he recalled

8    that Garnett's statement "grabbed [] Cintron's attention" and that "Cintron

9    looked over [UC 243's] left shoulder" and Roper "started moving quickly."

10   App'x at 317-18. But he also testified that, although he has "good hearing" and

11   was "standing only a few feet away" from Garnett, he "did not hear what []

12   Garnett said[.]" App'x at 321.

13       Garnett's account at trial differed greatly from those of UC 39 and UC 243.

14   Garnett testified that, in the late morning of November 19, 2011, he went to his

15   grandmother's house in order to drop off his niece and then sent a text message

16   to a friend, Quincy Brown, who invited Garnett to Brown's apartment and also

13

1    invited some other friends over.[3] After Garnett arrived at Brown's apartment and

2    had some drinks, Garnett testified that Cintron and Roper arrived at the

3    apartment but that he did not speak with them.

4         Garnett testified that he left Brown's apartment, alone, around

5    "nighttime." App'x at 363. Garnett said he went to Crown Fried Chicken, a

6    restaurant, which was near the bodega. Garnett said he did not see Roper or

7    Cintron "again after [he] left [Brown's] apartment." At Crown Fried Chicken,

8    Garnett testified that he ordered "the center breast," then "stepped out," and

9    "was going to walk in the [grocery] store" but saw that "it was crowded." App'x

10   at 364. Garnett said he was going to the bodega to buy a soda because the sodas

11   were cheaper in the bodega than they were at Crown Fried Chicken. But Garnett

12   denied entering the grocery store because the "doorway[] was, like, crowded"

13   and then he "heard the guy that work[ed] [at] the chicken spot knock on the

14   window, so [he] went back in there and grabbed the chicken, and found out [he]

---

[3] UC 39 noted that Garnett's trial testimony differed from his deposition
testimony. In his deposition, Garnett claimed that he was at his grandmother's
house the day of his arrest, that he went straight to a fried chicken restaurant,
and that he did not see Roper and Cintron at any time on November 19, 2011
until after he had been arrested.

14

had enough anyway for the soda, and walked directly across the street in[to] the game store." App'x at 365.

Garnett testified that he spoke to his cousin Shedy Bolton in the game store, but then was handcuffed by a police officer, searched both outside the game store and later at the 25th Precinct, and that the officers found no drugs,[4] contraband, or money, and that the only items he had on him at the time of his arrest were an iPod, a cell phone, Blistex, and the chicken. Importantly, Garnett testified that he had no involvement in the sale, did not act as a lookout, did not enter the store during the sale, and did not say anything to Cintron and Roper. Garnett flatly denied committing any crime on November 19, 2011.

Roper also testified at the federal trial. He confirmed that he, Cintron, and Garnett were at Quincy Brown's apartment earlier in the day on November 19, 2011, but, somewhat inconsistently with Garnett's testimony, Roper stated that all three of them—Garnett, Cintron, and Roper—"left Quincy Brown's house and headed to Lexington Avenue *together*." App'x at 453 (emphasis added). But

---

[4] Although Garnett testified that he may have had "K2" on him at the time of his arrest on November 19, 2011, App'x at 366, none of the briefs contests Garnett's statement that officers found no drugs or contraband on him.

15

Roper then testified that Garnett was "a little bit separated from us[,]" and when Cintron and Roper started "going toward the grocery store . . . [Garnett] started backing away from where we was going in the same direction" and Garnett instead went to the "chicken spot." App'x at 453.

Roper also testified that he and Cintron were "chilling" in front of the bodega when the "informants"—presumably UC 39 and UC 243—arrived and so Roper and Cintron "decided to go inside the store and make a sale[.]" App'x at 453. Roper testified that he believed that, at the time, Garnett was still at the "chicken spot, because if he was with us, he would have went inside the store with us." App'x at 453-54. Roper said he did not "remember seeing [Garnett] inside the store at all" and said he "remember[ed] it like it was yesterday." App'x at 454. Roper did not recall whether Garnett entered the store at any point and stated that he never heard Garnett say anything along the lines of "Hurry up, y'all ain't done yet. Get that money[.]" App'x at 449. Indeed, Roper testified that while he was in the store, he saw Garnett "cross the street" with a "brown bag in his hand." App'x at 449. Roper flatly denied that Garnett was involved in the sale.

## II.     Procedural History

### A. The Jury Instructions, Deliberations, and Verdict

At the conclusion of trial, the district court instructed the jury that, in order to establish his claims under Section 1983, Garnett had to demonstrate by a preponderance of the evidence that (1) the conduct of the defendant intentionally or recklessly deprived Garnett of a right protected by the Constitution of the United States, and (2) that the conduct was a proximate cause of the injuries and damages suffered by Garnett. *See* App'x at 523. Specifically with respect to the fair trial claim, the district court instructed the jury that Garnett had to show: "(1) that [UC 39] fabricated evidence of a material nature; (2) that the fabricated evidence of a material nature was likely to influence a jury's decision; (3) [that] this fabricated evidence of a material nature was intentionally forwarded to prosecutors by [UC 39]; and (4) [that Garnett] suffered a deprivation of liberty as a result of fabricated evidence of a material nature." App'x at 530. The verdict form asked the jury to determine whether Garnett had proven his false arrest, malicious prosecution, denial of the right to a fair trial, and failure to intervene claims by a preponderance of the evidence. There was no special interrogatory

asking the jury to determine whether there had been probable cause for Garnett's

arrest or prosecution.

At some point during the jury's deliberations, the district court received a

note from the jury stating, in relevant part:

> [W]e ask for clarification on probable cause. If an individual reasonably
> appears to have knowledge of a criminal transaction currently taking
> place, but does not appear to be involved, is probable cause established?

App'x at 568-69. Garnett's counsel asked the district court to instruct the jury that

mere knowledge of activity without involvement in the activity does not

constitute probable cause to arrest. The officers' counsel objected, stating a

response to that effect would "answer the question for [the jury]." App'x at 571.

Instead, the officers' counsel suggested the court should "refer the[ jury] back to

the law and explain the law." App'x at 571. The district court agreed, explaining:

> What I think I would like to do is to develop with you, counsel, a proposed
> response that will both refer the[ jury] back to the relevant language in the
> existing set of instructions, and try to point the[ jury] more closely to what
> it is that they're supposed to be evaluating here. Namely, whether or not a
> reasonable person would understand that Mr. Garnett was involved in
> criminal activity. And that that is taken from the point of view of a
> reasonable officer under the circumstances.

18

1   App'x at 571-72. Garnett's counsel reaffirmed his position that "mere knowledge

2   that criminal activity is ongoing is not in itself criminal activity" in response.

3   App'x at 572.

4        The district court then distributed a proposed supplemental instruction

5   which stated, in relevant part, "[i]f a reasonable person in the officer's shoes

6   looking at the totality of the circumstances would believe there is a probability

7   that the plaintiff had committed a crime or is committing a crime, there would be

8   probable cause for his arrest." App'x at 574. Garnett's counsel renewed his

9   objection, again asking for an instruction that mere knowledge is not sufficient.

10  After a colloquy between counsel and the court, the district court revised the

11  proposed instruction and added a sentence that stated if "a reasonable person in

12  the officer's shoes looking at the totality of the circumstances would not believe

13  that there was a probability that the plaintiff had committed a crime or was

14  committing a crime, there would not be probable cause for his arrest." App'x at

15  575. Garnett's counsel maintained his objection, arguing the language was not

16  responding to the jury's question, but conceded that the instruction was an

19

accurate statement of the law. The district court delivered the instruction to the jury.

The jury subsequently returned a verdict finding that Garnett had proven his denial of the right to a fair trial claim by a preponderance of the evidence but had not proven his false arrest, malicious prosecution, or failure to intervene claims. The jury awarded Garnett punitive damages of $20,000 and nominal damages of $1.

### B. The District Court's Decision on the Post-Trial Motions

Following the trial, UC 39 moved for, in relevant part, judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 on the denial of a right to a fair trial claim.[5] UC 39 argued that the fabricated evidence did not cause Garnett's deprivation of liberty because UC 39 had had probable cause to arrest Garnett. *Garnett v. Undercover Officer C0039*, No. 1:13-cv-7083, 2015 WL 1539044, at *3 (S.D.N.Y. Apr. 6, 2015). The district court denied UC 39's motion, holding that the arguments were "wrong as a matter of law." *Id.* at *1.

---

[5] Before the jury was charged, UC 39 moved for a directed verdict on all claims against him pursuant to Federal Rule of Civil Procedure 50. He renewed that motion after trial.

1   Specifically, the district court relied on *Ricciuti v. N.Y.C. Transit Authority*, 124

2   F.3d 123 (2d Cir. 1997) for the principle that "'[n]o arrest, no matter how lawful

3   or objectively reasonable, gives an arresting officer or his fellow officers license to

4   deliberately manufacture false evidence against an arrestee. To hold that police

5   officers, having lawfully arrested a suspect, are then free to fabricate false

6   [information] at will, would make a mockery of the notion that Americans enjoy

7   the protection of due process of the law and fundamental justice.'" *Garnett*, 2015

8   WL 1539044 at *1 (quoting *Ricciuti*, 124 F.3d at 130). The district court held that

9   *Ricciuti* directly controlled the outcome of UC 39's motion for judgment as a

10  matter of law, and accordingly denied the motion. *Id.* at *1, *4-*6.

11      At the same time, Garnett moved for a new trial pursuant to Federal Rule

12  of Civil Procedure 59 on his false arrest, malicious prosecution, and failure to

13  intervene claims based on the district court's response to the jury's question

14  regarding probable cause. *Id.* at *3, *12-*14. The district court determined that its

15  response to the jury note was both "an accurate statement of the law" and

16  "adequately addressed the jury's question[.]" *Id.* at *14. Accordingly, the district

17  court denied Garnett's motion because its "instruction on probable cause, taken

as a whole, [wa]s correct and sufficiently covered the case so that the jury could intelligently determine the questions presented to it." *Id.* (internal quotation marks and citation omitted).

## DISCUSSION

### I.  The District Court Did Not Err in Denying UC 39's Motion for Judgment As A Matter of Law

#### A. Standard of Review

This court reviews a district court's denial of a motion for judgment as a matter of law de novo. *Manganiello v. City of New York*, 612 F.3d 149, 161 (2d Cir. 2010). In doing so, the court "appl[ies] the same standards that are required of the district court." *Id.* (internal quotation marks and citation omitted). Accordingly, the court "must draw all reasonable inferences in favor of the nonmoving party," "may not make credibility determinations or weigh the evidence[,]" and "must disregard all evidence favorable to the moving party that the jury is not required to believe." *Id.* (internal quotation marks, emphases, and citations omitted).

### B. Applicable Law and Analysis

1    The instant case presents this court with an important legal question:

2    whether *Ricciuti*'s holding—that a Section 1983 plaintiff may sue for denial of the

3    right to a fair trial based on a police officer's fabrication of information—applies

4    when the information fabricated is the officer's own account of his or her

5    observations of alleged criminal activity, which he or she then conveys to a

6    prosecutor. We answer that question in the affirmative, while emphasizing the

7    essential limiting principles encompassed by the *Ricciuti* standard.

8    In *Ricciuti*, the court flatly rejected the argument that "as long as [an] arrest

9    complied with the Fourth Amendment, [a Section 1983 plaintiff] can have no

10   claim for post-arrest fabrication of evidence against [him or her]." 124 F.3d at 130.

11   *Ricciuti* grew out of an altercation between Harlice Watson, an African-American

12   New York City Corrections officer, and Alfred Ricciuti, a white civilian. *Id.* at

13   125. After Watson complained to police that Ricciuti had assaulted him, Ricciuti

14   was arrested. Lieutenant Robert Wheeler, a police lieutenant who interviewed

15   Ricciuti, wrote in a report that Ricciuti had confessed to being drunk, to having

16   hit Watson, and to having addressed Watson using a racial epithet. *Id.* at 126. The

1  purported confession, which Ricciuti (and his nephew, who had been present at

2  the interview with Wheeler) insisted was fabricated by Wheeler, made its way

3  into several subsequent investigation reports and, based in part on the

4  confession, the assault was classified as bias-related and the Bronx district

5  attorney added a charge of aggravated harassment in the second degree. *Id.* All

6  charges were subsequently dismissed by a pre-trial court order after Lieutenant

7  Wheeler, despite multiple adjournments, "failed to appear to testify in support of

8  the 'confession.'" *Id.* at 127.

9      During Ricciuti's subsequent Section 1983 federal civil case for violation of

10  his constitutional right to a fair trial, the district court granted defendants'

11  motion for summary judgment based in relevant part on defendants' argument

12  that "so long as there was probable cause for Alfred Ricciuti's arrest—

13  independent of the allegedly fabricated evidence—the fabrication of evidence is

14  legally irrelevant." *Id.* at 129-30. On appeal, the panel decisively rejected

15  defendants' argument in an opinion that is worth quoting at length:

16      This argument—an ill-conceived attempt to erect a legal barricade to
17      shield police officials from liability—is built on the most fragile of
18      foundations; it is based on an incorrect analysis of the law and at the same
19      time betrays a grave misunderstanding of those responsibilities which the

24

police must have toward the citizenry in an open and free society. No arrest, no matter how lawful or objectively reasonable, gives an arresting officer or his fellow officers license to deliberately manufacture false evidence against an arrestee. To hold that police officers, having lawfully arrested a suspect, are then free to fabricate false confessions at will, would make a mockery of the notion that Americans enjoy the protection of due process of the law and fundamental justice. Like a prosecutor's knowing use of false evidence to obtain a tainted conviction, a police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable corruption of the truth-seeking function of the trial process.

When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983. Here, a reasonable jury could find, based on the evidence, that defendants . . . violated the plaintiffs' clearly established constitutional rights by conspiring to fabricate and forward to prosecutors a known false confession almost certain to influence a jury's verdict. These defendant police officers are not entitled to summary judgment on the ground of qualified immunity. Qualified immunity is unavailable where, as here, the action violates an accused's clearly established constitutional rights, and no reasonably competent police officer could believe otherwise.

*Id.* at 130 (internal quotation marks and citations omitted). *Ricciuti*'s reasoning

applies as much to a situation where, as here, the falsified information was the

officer's account, conveyed to prosecutors, of what he heard the defendant say or

do during the alleged offense, as it did in *Ricciuti*, where the officer was

describing what he heard the defendant say during an interview after his arrest.

25

1    UC 39 makes two arguments against relying on *Ricciuti*. First, UC 39

2    argues that *Ricciuti* does not control this case because *Ricciuti* addressed only

3    whether qualified immunity was available to police officers who willfully

4    fabricated evidence, rather than the merits of Ricciuti's denial of the right to a fair

5    trial claim. *See Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012).

6    Second, UC 39 argues that falsification of evidence has always been addressed

7    under the auspices of false arrest and malicious prosecution claims under the

8    Fourth Amendment. UC 39 maintains that application of a denial of the right to a

9    fair trial claim to falsified evidence would upset the balance between liability and

10   probable cause developed in Fourth Amendment jurisprudence.

11   On the first point, UC 39 is incorrect that *Ricciuti*'s holding is limited to the

12   question of immunity. In *Ricciuti*, the panel held that fabrication of evidence

13   violated a "clearly established constitutional right[]" and thus the officers were

14   not entitled to qualified immunity. *Ricciuti*, 124 F.3d at 130 ("Qualified immunity

15   is unavailable where, as here, the action violates an accused's clearly established

16   constitutional rights, and no reasonably competent police officer could believe

17   otherwise."). Thus, in order to find that the officers were not entitled to qualified

26

1    immunity, the panel necessarily *also* held that the officers' conduct in fabricating

2    Ricciuti's supposed "confession" violated a clearly established constitutional

3    right, the right to a fair trial.[6] As the *Ricciuti* court explained, "[w]hen a police

4    officer creates false information likely to influence a jury's decision and forwards

5    that information to prosecutors, he violates the accused's constitutional right to a

6    fair trial[.]" *Id.*; *see also Morse*, 804 F.3d at 548 (citing *Ricciuti* for this proposition);

7    *Zahrey v. Coffey* , 221 F.3d 342, 344, 348, 355 (2d Cir. 2000) (citing *Ricciuti* for this

8    proposition and concluding that qualified immunity did not apply because there

9    is a clearly established "constitutional right not to be deprived of liberty as a

10   result of the fabrication of evidence by a government officer acting in an

11   investigatory capacity," and noting that the "liberty deprivation" was the eight

12   months of confinement plaintiff experienced between bail revocation and his

13   acquittal, while the due process violation was "the manufacture of false

14   evidence" against him). We find UC 39's argument that *Ricciuti* does not address

---

[6] Whether this right is rooted in the Sixth Amendment or Fifth and Fourteenth
Amendments, or both, is an issue we need not decide because the constitutional
harm resulting from the falsified information at issue is in any event redressable
in an action for damages under 42 U.S.C. § 1983. *See Morse v. Fusto*, 804 F.3d 538,
547 n.7 (2d Cir. 2015), *petition for cert. docketed*, No. 15-1510 (June 15, 2016).

1     the merits of the fair trial claim unpersuasive, as well as contrary to the explicit

2     reasoning of our opinion in that case.[7]

3           UC 39's reliance on *Jovanovic v. City of New York*, a non-precedential

4     summary order, is also misplaced. In *Jovanovic,* the court stated that the elements

5     of a denial of the right to a fair trial claim were: "an (1) investigating official

6     (2) fabricates evidence (3) that is likely to influence a jury's decision, (4) forwards

---

[7] Not surprisingly, in light of our language in *Ricciuti*, many district courts in our circuit have cited *Ricciuti* as controlling on the merits of fair trial claims, and not merely in qualified immunity cases. *See, e.g., Gomez v. City of New York*, 14-CV-2621, 2016 WL 2591883, at *3 (E.D.N.Y. May 5, 2016) (citing *Ricciuti*, among other authorities, for the proposition that "[w]hen an officer supplies false information to a prosecutor about a suspect, the officer has violated that suspect's right to a fair trial[,] . . . even if the officer had probable cause to arrest the accused," as well as for the proposition that qualified immunity is unavailable "where, as here, the action violates an accused's clearly established constitutional rights, and no reasonably competent officer could believe otherwise"); *Soomro v. City of New York*, No. 13CV0187, 2016 WL 1266069, at *6 (S.D.N.Y. Mar. 30, 2016) ("The Second Circuit's 1997 precedential decision in *Ricc[iu]ti* makes it clear that the fabrication and provision of material false evidence to a prosecutor is a violation of clearly established constitutional rights of the accused."); *Pesola v. City of New York*, 15-cv-1917, 15-cv-1918, 2016 WL 1267797, at *10 (S.D.N.Y. Mar. 30, 2016) (quoting *Ricciuti*, 124 F.3d at 130); *Ganek v. Leibowitz*, 15cv1446, 2016 WL 929227, at *9 (S.D.N.Y. Mar. 10, 2016) (same), *appeal docketed*, No. 16-1463 (2d Cir. May 9, 2016).

that information to prosecutors, and (5) the plaintiff suffers a deprivation of

liberty as a result." 486 F. App'x at 152. UC 39 interprets the "as a result"

language of the fifth element to mean that the falsified information must be the

*only* reason the plaintiff suffered a deprivation of his liberty, such that a

privileged arrest is sufficient to negate this element of an arrestee's Section 1983

claim. UC 39 places more weight on the "as a result" language than it can bear.

    First, the cited language is not the holding of the case, which neither

purports to decide any new point of law nor claims to constrict or revise the

holding of *Ricciuti*. The recitation of elements is simply a restatement of the

holdings of prior cases. Second, that formulation is in fact derived from the

following language in *Ricciuti*: "When a police officer creates false information

likely to influence a jury's decision and forwards that information to prosecutors,

he violates the accused's constitutional right to a fair trial, and the harm

occasioned by such unconscionable action is redressable in an action for damages

under 42 U.S.C. § 1983." *Ricciuti*, 124 F.3d at 130; *see Jovanovic*, 485 F. App'x at 152

(citing *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2003), and *Ricciuti*, 124 F.3d at

130); *Jocks*, 316 F.3d at 138 (quoting *Ricciuti*, 124 F.3d at 130). But that language

1    cannot mean what UC 39 would have it mean. In *Ricciuti*, as here, the court was

2    addressing a claim of a denial of the right to a fair trial based on an officer's

3    provision of false information where the arrest itself had been privileged. *See* 124

4    F.3d at 130. Thus, even though the arrest of one of the plaintiffs, Alfred Ricciuti,

5    was supported by probable cause, and therefore a privileged arrest accounted for

6    at least some portion of the deprivation of his liberty, the *Ricciuti* court

7    nevertheless found that Alfred Ricciuti had suffered a deprivation of liberty as a

8    result of the officer's fabrication of a false confession. *Id. Ricciuti* thus necessarily

9    stands for the proposition that a privileged arrest is insufficient to negate the fifth

10   element of a fair trial claim when an officer falsifies information "likely to

11   influence a jury's decision and forwards that information to prosecutors." *Id.*

12   Third, the conclusion is entirely sound. An *arrest* is lawful when supported by

13   probable cause—a rather low threshold. But an arrest in itself may involve only a

14   limited deprivation of liberty. The setting of bail, which may make the difference

15   between freedom and confinement pending trial, and the prosecutor's decision

16   to pursue charges rather than to dismiss the complaint without further action,

17   may depend on the prosecutor's and magistrate's assessments of the strength of

30

the case, which in turn may be critically influenced by fabricated evidence. Thus,

a further deprivation of liberty can result from the fabrication of evidence even if

the initial arrest is lawful. Fourth, *Jovanovich* itself, in the very next sentence after

the one relied upon by UC 39, explicitly states "[p]robable cause is not a defense"

to a claim for a denial of the right to a fair trial. 486 F. App'x at 152.

In short, a Section 1983 claim for the denial of a right to a fair trial based on

an officer's provision of false information to prosecutors can stand even if the

officer had probable cause to arrest the Section 1983 plaintiff. The language of

*Jovanovic* cannot support the meaning UC 39 assigns to it.

UC 39's second argument, that Garnett's claim based on falsified

information is only cognizable as a claim for malicious prosecution or for false

arrest under the Fourth Amendment, and not as an independent fair trial claim,

is similarly unpersuasive.

First, claims alleging the denial of a right to a fair trial based on fabricated

information are redressable under the Constitution, regardless of which

constitutional provision provides the basis for the claim—"[c]ertain wrongs

affect more than a single right and, accordingly, can implicate more than one of

31

the Constitution's commands." *See Soldal v. Cook Cty., Ill.,* 506 U.S. 56, 70 (1992);

*see also Gregory v. City of Louisville,* 444 F.3d 725, 750–51 (6th Cir. 2006) (reversing

district court's conclusion that one factual premise could not form the basis of

separate claims of constitutional violations under Section 1983); *Riley v. City of*

*Montgomery, Ala.,* 104 F.3d 1247, 1253–54 (11th Cir. 1997) (permitting a

fabrication-of-evidence claim to go forward against one defendant while

rejecting malicious prosecution claim against others). Indeed, our sister circuits

have recognized that a plaintiff may pursue an independent due process claim

premised on fabricated evidence. As the Fifth Circuit has observed, we, along

with the Eighth, Ninth, and Tenth Circuits, have "all found denials of due

process when charges rest on fabricated evidence," and the Fifth Circuit agrees

that there is "a due process right not to have police deliberately fabricate

evidence and use it to frame and bring false charges against" an arrestee. *Cole v.*

*Carson*, 802 F.3d 752, 770-71 (5th Cir. 2015), *petition for cert. docketed*, No. 16-351

(Sept. 19, 2016).

　　　Second, probable cause, which is a Fourth Amendment concept, should

not be used to immunize a police officer who violates an arrestee's non-Fourth

32

1    Amendment constitutional rights. *See Ricciuti*, 124 F.3d at 129-30 (rejecting

2    defendants' argument that "so long as there was probable cause for [the] arrest . .

3    . the fabrication of evidence is legally irrelevant" because such a rule would

4    "make a mockery of the notion that Americans enjoy the protection of due

5    process of the law and fundamental justice."); *see also Robinson v. City of Garland,*

6    *Tex.*, No. 3:10-CV-2496-M, 2016 WL 1253557, at *8 (N.D. Tex. Feb. 29, 2016)

7    (Ramirez, Mag. J.) ("There may be a due process violation . . . when police

8    intentionally fabricate evidence, successfully get someone falsely charged, and

9    relief under the Fourth Amendment is unavailable. The presence of probable

10    cause does not forestall Plaintiff's options under the Fourteenth Amendment."

11    (citations omitted)). Relatedly, using probable cause as a shield would unduly

12    limit an arrestee's right to relief when a police officer fabricates evidence.

13    Because probable cause is no defense to a denial of the right to a fair trial claim,

14    fair trial claims cover kinds of police misconduct not addressed by false arrest or

15    malicious prosecution claims. *See Ricciuti*, 124 F.3d at 130 ("[A] police officer's

16    fabrication and forwarding to prosecutors of known false evidence works an

17    unacceptable corruption of the truth-seeking function of the trial process."

1    (internal quotation marks and citations omitted)); *see also Castellano v. Fragozo*,

2    352 F.3d 939, 955 (5th Cir. 2003) (finding jury instructions "deeply flawed" when

3    they limited the jury's use of fabricated evidence to evaluate a Fourth

4    Amendment malicious prosecution claim without allowing a finding of a

5    Fourteenth Amendment due process violation).

6         Third and lastly, any limitation of false information allegations to false

7    arrest and malicious prosecution claims would ignore the collateral

8    consequences that are associated with fabricated information even if the officer

9    had probable cause for the initial arrest. As the Fifth Circuit has observed,

10   "[b]eing framed and falsely charged" damages an individual's reputation,

11   requires that individual to "mount a defense, and places him in the power of a

12   court of law[.]" *Cole*, 802 F.3d at 772 (footnote omitted). "[T]hese wrongs . . . do

13   not disappear where there is no violation of [the Fourth A]mendement" and,

14   "where there is no more specific constitutional protection available, the

15   Fourteenth Amendment may offer protection." *Id.* (citations omitted); *see Lisker v.*

16   *City of L.A.*, 780 F.3d 1237, 1242 (9th Cir. 2015) (explaining that "police

17   investigative materials have evidentiary value wholly apart from assisting trial

34

1   testimony—they comprise part of the documentary record before the prosecution

2   and defense and affect charging decisions, plea bargaining, and cross-

3   examination of the investigating officers" (internal quotation marks and citation

4   omitted)).

5     Although we hold that *any* information fabricated by an officer can serve

6   as the basis of a claim for a denial of the right to a fair trial, we acknowledge

7   concerns raised by the City of New York ("City") about attaching liability for

8   false information to an officer's account of his or her own observations of an

9   alleged criminal activity giving rise to an arrest. For example, the City posits that

10  an affirmance of *Ricciuti* would lead to the retrial of every unsuccessful state

11  prosecution as a federal Section 1983 action and would turn an individual's

12  resentment at being prosecuted into allegations of fabrication against police

13  officers. The City cautions that such retrials would impose burdens on society by

14  chilling the work of honest officers and by diverting energy away from general

15  policing and towards defensive litigation.

16    This court does not take those concerns lightly. Nonetheless, the City's

17  proposed distinction between fabricated testimony about what an officer claims

35

1    to have seen during a "buy and bust" and fabricated testimony about a

2    purported confession is incoherent. The court's holding in *Ricciuti* covers "false

3    information," 124 F.3d at 130, not merely false information about confessions.

4    The information fabricated by Lieutenant Wheeler in *Ricciuti*, exactly like the

5    fabricated information at issue here, is nothing more or less than a false account

6    of something the officer claimed to have seen or heard the defendant say, which

7    he forwarded to prosecutors and to which he would be expected to testify at

8    trial. That the officer here fabricated testimony about what he heard in a bodega,

9    rather than what he heard in a police station during an interview, cannot

10    conceivably make a difference. Having considered the City's policy arguments,

11    we find that the standard outlined in *Ricciuti* places appropriate limitations on

12    the availability of a claim for denial of the right to a fair trial based on fabrication

13    of information by a police officer which serve to address the City's fears.

14        As the jury was properly instructed here, the standard in *Ricciuti* restricts

15    fair trial claims based on fabrication of information to those cases in which an

16    (1) investigating official (2) fabricates information (3) that is likely to influence a

17    jury's verdict, (4) forwards that information to prosecutors, and (5) the plaintiff

suffers a deprivation of life, liberty, or property as a result. *See Ricciuti*, 124 F.3d

at 130; *see also Jocks*, 316 F.3d at 138. In order to succeed on a claim for a denial of

the right to a fair trial against a police officer based on an allegation that the

officer falsified information, an arrestee must prove by a preponderance of the

evidence that the officer created false information, the officer forwarded the false

information to prosecutors, and the false information was likely to influence a

jury's decision. *See, e.g.*, *Ricciuti v. N.Y.C. Transit Auth.*, 70 F. Supp. 2d 300, 331

(S.D.N.Y. 1999) (jury charge on the denial of constitutional right to a fair trial

claim on remand in *Ricciuti*). These requirements all provide necessary limits on

the reach of a denial of a fair trial claim based on false information.

　　In particular, the requirements that the information be both false and likely

to influence a jury's decision constrain the types of information that can serve as

the basis for a denial of the right to a fair trial claim. *Ricciuti* has been the law for

nearly twenty years, without the dire results that the City predicts from the

perfectly routine application of its principles to the facts here. Experience thus

suggests that the limiting principles of *Ricciuti* have proven effective to date in

restricting claims for a denial of the right to a fair trial against police officers on

the basis of false information. The court thus embraces the limiting principles

inherent in the *Ricciuti* standard while affirming that *Ricciuti*'s holding applies to

falsified information contained in an officer's account of his or her observations

of alleged criminal activity which he or she conveys to prosecutors.

## II.     The District Court Did Not Err in Denying Garnett's Motion for A New Trial

### A. Standard of Review of Jury Instructions

This court reviews supplemental jury charges for abuse of discretion. *See*

*Uzoukwu v. City of New York*, 805 F.3d 409, 414 (2d Cir. 2015). "[I]f a supplemental

jury charge is legally correct, the district court enjoys broad discretion in

determining how, and under what circumstances, that charge will be given." *Id.*

(internal quotation marks and citation omitted). Further, "a trial court

responding to a note from a deliberating jury is only required to answer the

particular inquiries posed" and it "enjoys considerable discretion in construing

the scope of a jury inquiry and in framing a response tailored to the inquiry."

*United States v. Rommy*, 506 F.3d 108, 126 (2d Cir. 2007) (citations omitted).

**B.  Analysis**

1

2    In his cross-appeal, Garnett argues that the district court erred in declining

3    to instruct the jury, in response to the jury's request for clarification on the issue,

4    that mere knowledge of criminal activity without involvement in the activity

5    does not constitute probable cause to arrest.

6    We find the district court did not abuse its discretion in declining to give

7    this instruction. First, Garnett's counsel agreed that the supplemental instruction

8    in response to the jury's note "accurate[ly]" stated the law to the extent that it

9    charged "an innocent person could be arrested if it appears to a reasonable

10   officer that a crime was being committed [by that person]." App'x at 577-78. "[A]

11   jury instruction will be deemed adequate, so long as the charge, taken as a whole,

12   is correct and sufficiently covers the case so that a jury can intelligently

13   determine the questions presented to it." *Care Travel Co. v. Pan Am. World*

14   *Airways,* 944 F.2d 983, 996 (2d Cir. 1991) (internal quotation marks and citations

15   omitted). Because the district court's probable cause instruction was "correct and

16   sufficiently covered the essential issues[,]" *Luciano v. Olsten Corp.*, 110 F.3d 210,

17   218 (2d Cir. 1997) (internal quotation marks and citation omitted), we cannot say

1    that the supplemental instruction "created a distinct risk of confusing the jury[,]"

2    *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 118 (2d Cir. 2000). The district court's

3    instructions made clear, and correctly so, that probable cause is evaluated by

4    examining, "based on the totality of the circumstances," whether the police

5    officer has "knowledge of or reasonably trustworthy information as to facts and

6    circumstances . . . sufficient to warrant a person of reasonable caution in the

7    belief that an offense has been or is being committed by the person to be

8    arrested." App'x at 524. That instruction was sufficient to make clear that

9    (a) what matters is the officer's reasonable belief; and (b) that the reasonable

10   belief has to be that the individual to be arrested "has been or is . . . commit[ing]"

11   a criminal offense. *Id.* Along with this probable cause instruction, the district

12   court instructed the jury that Garnett had been arrested for criminal sale of a

13   controlled substance and that Garnett could be liable for the conduct of others if,

14   "acting with the mental culpability required for the commission thereof, he

15   intentionally aids such person in such conduct." App'x at 526-27. The

16   supplemental instruction reiterated these basic principles that are central to

17   probable cause and to the offense for which Garnett was arrested. Thus,

40

1  combining the district court's instructions on probable cause and aiding and

2  abetting, the charge taken as a whole made clear that for UC 39 to have probable

3  cause to believe that Garnett was aiding and abetting a drug sale, the officer

4  would have to have had a reasonable belief that Garnett not only knew that an

5  illegal transaction was occurring, but also was "intentionally aiding" that sale of

6  narcotics. Accordingly, we hold that the district court's supplemental charge

7  "correct[ly] and sufficiently covered the essential issues" with respect to the

8  jury's question on probable cause. *See Luciano*, 110 F.3d at 218.

9      Furthermore, the district court expressly permitted the jury to send

10  another note if its supplemental instruction did not answer the original question,

11  but the jury did not do so. Thus, this court is satisfied that the district court did

12  not abuse its discretion in giving the challenged supplemental jury charge.

13                              **CONCLUSION**

14      For the foregoing reasons, this court holds that the district court did not err

15  in denying UC 39's motion for judgment as a matter of law or in denying

16  Garnett's motion for a new trial. In doing so, this court confirms that the holding

17  of *Ricciuti*, along with the limiting standard therein, applies to false information

41

1    contained in an officer's own account of his or her observations of alleged

2    criminal activity giving rise to an arrest which he or she then conveys to

3    prosecutors. Accordingly, the decision of the district court is **AFFIRMED**.